# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| JOSEPH COCCHINI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:23-cv-01185 |
| | ) | |
| THE CITY OF FRANKLIN, | ) | |
| TENNESSEE, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Joseph Cocchini ("Cocchini") brings suit against the City of Franklin, Tennessee ("City of Franklin") and Officer Kevin Spry, in his individual capacity ("Officer Spry") (collectively, "Defendants"). (Doc. No. 28). This case arises out of Defendants' alleged mistreatment of Cocchini when Officer Spry arrested Cocchini at the Franklin Pride Festival ("Franklin Pride") while he shared his Christian testimony with fellow festivalgoers representing their church. Because of the alleged mistreatment, Cocchini brought two claims for constitutional violations under 42 U.S.C. § 1983 ("§ 1983") and a claim for declaratory relief under 28 U.S.C. § 2201 against Defendants. Before the Court is Officer Spry's, Officer Alan Yates's ("Officer Yates"), and Lieutenant Eric Anderson's ("Lieutenant Anderson") Motion to Dismiss (Doc. No. 40), which has been exhaustively briefed and is ripe for review (Doc. Nos. 40, 41, 43, 45, 48, 49).[1] For the following reasons, the Court will grant in part and deny in part the motion as to Officer Spry. The

---

[1] Officer Spry failed to include page numbers in his briefing, in violation of the Local Rules. See M.D. Tenn. L.R. 7.03(a) (documents for filing must have all pages "numbered at the bottom"). Accordingly, when the Court refers to pages in Officer Spry's briefing, it will reference the PageID number.

Court will deny the motion as moot as to Officer Yates and Lieutenant Anderson, because each have been voluntarily dismissed. (Doc. No. 43).

## I. BACKGROUND AND FACTUAL ALLEGATIONS[2]

Franklin Pride TN, a Tennessee non-profit corporation, is the entity responsible for Franklin Pride. (Doc. No. 28 ¶¶ 22, 66, 67). On January 16, 2023, Robert McNamra ("McNamra"), the Fundraising Chair and Advisor to Executive Committee of Franklin Pride TN, filed a Special Event Permit Application ("Application") with the City of Franklin for Franklin Pride to be held at the Harlinsdale Farm Park ("Park") on June 3, 2023. (Id. ¶¶ 66–67). In the Application, McNarma described Franklin Pride as follows:

> The mission of Franklin Pride TN is to educate, inform and foster community that brings together LGBTQIA+ people and their allies in a social, non-threatening and empowering setting to uplift, educate and present positive images that help maintain a healthy, productive and visionary community in Williamson County and surrounding areas and such other purposes that the board may authorize from time to time that are consistent with the requirements of Section 501(c)(3) Code. This purpose may be realized through the production of one or more annual events designed to celebrate pride in LGBTQIA+ individuals in a safe setting where all participants experience equality and acceptance. Franklin Pride is a free one-day family friendly festival with food trucks, two stages of live music/entertainment, vendor booths, nonprofit booths, a youth activity and a teen activity area, picnic area, and a beer tent (21 and up). There will not be a drag show in the park. We will rent the entire park so anyone entering the park on June 3 will enter knowing they are attending Franklin Pride.

(Id. ¶ 68). The Application listed Franklin Pride as a free event, open to the public at large. (Id. ¶ 69). The City of Franklin assigned 30 police officers to provide armed security at the event. (Id. ¶ 39).

On April 8, 2023, Franklin Pride publicly posted a video on its Instagram page, in which Clayton Klutts ("Klutts"), the President of Franklin Pride TN, stated: "We do not allow anyone to

---

[2] The Court draws the facts in this section from the Amended Complaint (Doc. No. 28) ("Complaint") and assumes the truth of those facts for purposes of ruling on the instant motion. See Erickson v. Pardus, 551 U.S. 89, 94 (2007).

2

proselytize for any reason their religion, their politics, their lifestyle." (Id. ¶ 70). In another segment of the video, a programming and entertainment board member of Franklin Pride TN, Sandra Morton ("Morton"), stated: "We do require unconditional acceptance of the LGBTQ person." (Id. ¶ 73).

Cocchini is a member of a group of Christian evangelists called the "Nashville Evangelists." (Id. ¶ 19). Nashville Evangelists gather "to engage in peaceful, religious expression and ministry outreach" at various events and locations throughout the year. (Id. ¶ 20). To that end, Cocchini and several other members of Nashville Evangelists decided to attend Franklin Pride at the Park at Harlinsdale Farm ("Park"), seeing it as an opportunity to peacefully share gospel at a public gathering. (Id. ¶ 21).

On June 3, 2023, Cocchini and fellow Nashville Evangelists attended Franklin Pride at the Park. (Id. ¶ 23). That day, Cocchini sported a t-shirt with the message: "Jesus Changed My Life. Ask Me How." (Id. ¶ 30). At the welcome tent to Franklin Pride, Cocchini was scanned with a metal detecting wand and given a visitor wristband. (Id. ¶ 28). Franklin Pride did not charge anyone an admission fee to the event. (Id. ¶ 6). Cocchini made sure to read the Rules and Policies posted at Franklin Pride concerning any prohibited activities. (Id. ¶ 29). The Rules and Policies stated:

- All Attendees will be provided with a Free Wristband upon entering the Festival Area. This wristband will signify that you agree to adhere to all of our Rules and Policies. Those under age 3 can receive an ink stamp. Attendees must wear a wristband at all times, or you will be asked to leave the Festival. Wristbands will be available at the Welcome Tent.
- Bags will be searched upon entry to the Festival. We encourage small and or clear bags.
- We strongly recommend that anyone age 13 and under are accompanied by an adult.
- Dogs on leash are welcome at the Festival.
- Attire appropriate for a family event is required.
- Alcohol Rules

3

- No underage Drinking is Permitted.
  - No outside alcoholic beverages are permitted.
  - Over 21 wristbands will be available at the Welcome Tent and the Beer Tent.
  - Drink tickets will be for sale at the Welcome Tent and the Beer Tent.
  - Persons will not be allowed into the Festival if they are intoxicated or pose a treat to themselves or others.
  - Please drink responsibly.
- Lost Child Station
  - The Lost Child Station will be at the Welcome Tent.
- Additional Rules
  - No fighting or threatening behavior, any person found fighting will be ejected from the Festival.
  - No disorderly or disruptive behavior will be tolerated.
  - Weapons are not allowed at the Festival.
  - Any items that can be used as a means to disturb the peace, endanger the safety of the crowd, and/or inflict damage to people and/or goods are prohibited.
  - All State and Local laws will be enforced.

(Id. ¶ 74).

Once inside the Park, Cocchini and another Nashville Evangelist member, Ben Gonzales ("Gonzales"), proceeded to different Franklin Pride booths and vendors, and spoke with other attendees. (Id. ¶¶ 31–33). Eventually, Cocchini and Gonzales came to a booth sponsored by the Glendale United Methodist Church. (Id. ¶ 34). Cocchini stopped to read a sign displayed at the booth, which said:

> You Are Welcome Here. No matter: where you have come from or where you are going. What you believe or what you may doubt. What you are feeling or just not feeling. What you have or don't have. And no matter the color of your skin. Who you love or how you identify.

(Id.). While Cocchini read the sign, a woman approached him and asked if he had any questions. (Id. ¶ 35). Cocchini responded: "yes, are you Christian?" (Id. ¶ 36). The woman replied: "yes, I am." (Id.). Cocchini then "quietly and politely" asked the woman if she would share her understanding of the gospel with him, so he could better understand what she believed. (Id. ¶ 37). The woman appeared confused by the question. (Id.). As Cocchini and the woman continued their

4

conversation, another woman, wearing a t-shirt indicating that she was a pastor, approached them. (Id.). Cocchini assumed the second woman was a pastor of Glendale United Methodist Church. (Id.). As the two women seemingly welcomed the conversation of religion, Cocchini "quietly" began to share his Christian testimony with them. (Id. ¶ 38).

During this conversation, four City of Franklin police officers, including Officer Spry, gathered behind Cocchini. (Id. ¶ 40). Officer Spry got Cocchini's attention and instructed him and Gonzales to leave the Park. (Id.). Cocchini asked if he had broken any law, to which Officer Spry responded: "no." (Id. ¶ 41). Rather, Officer Spry told Cocchini that he was asking Cocchini to leave because the security event coordinator, Leslie Carillo ("Carillo"), asked that he be removed. (Id. ¶¶ 42, 43). Cocchini asked whether he was on publicly owned property. (Id. ¶ 44). Officer Spry told Cocchini that the Park was normally public property but was now private property because Franklin Pride "rented" out the Park for the event. (Id.).

Cocchini again asked what he had done wrong, and why he was being ordered to leave. (Id. ¶ 45). Officer Spry responded, stating that the "discussion was over." (Id.). Officer Spry further instructed Cocchini: "I am going to tell you one more time to either walk with us to leave or else you are going to be arrested." (Id.). Cocchini asked what offense he had committed that he was being arrested for, to which Officer Spry reiterated: "I'm going to tell you one more time to leave or else I am going to arrest you. Are you going to leave or am I going to have to arrest you?" (Id. ¶ 46). Officer Spry then consulted with his superior officer, Lieutenant Anderson. (Id. ¶ 47). At Lieutenant Anderson's instruction, Officer Spry placed Cocchini under arrest. (Id. ¶¶ 47–48). Cocchini was taken by police squad car to the City of Franklin Police Department, where he was booked and detained on a charge of criminal trespass. (Id.).

On November 7, 2023, Judge M.T. Taylor of the General Sessions Court of Williamson County, Tennessee conducted a preliminary hearing on the criminal trespass charge against Cocchini. (Id. ¶ 50). During the hearing, Officer Spry testified that on the morning of Franklin Pride, he and several other officers attended a briefing where they were instructed regarding their role in providing security at the event. (Id. ¶ 51). Twenty-nine city officials, police, and emergency personnel attended the briefing. (Id. ¶ 52). During the briefing, Officer Spry's superiors instructed him and others that if the event coordinators or event security coordinators for Franklin Pride said they wanted someone removed from the event, for any reason, then they were to remove them. (Id. ¶¶ 54, 57).

Officer Spry testified that he and his fellow officers were operating as on-duty officers for the City of Franklin but were assigned to Franklin Pride to patrol the event and maintain security. (Id. ¶ 56). Further, Officer Spry explained that his superiors instructed that the Park, which was normally public property, had been "rented out" by Franklin Pride and was to be treated as though it was private property throughout the course of Franklin Pride. (Id. ¶ 57). Additionally, during the briefing the city officials discussed interpretations of the criminal trespass laws, as relating to Franklin Pride. (Id. ¶ 60).

During Officer Spry's testimony in General Sessions Court, he confirmed that he did not observe Cocchini engage in any criminal or wrongful conduct when he first approached Cocchini on the date of his arrest. (Id. ¶ 62). Officer Spry further testified that Cocchini had not engaged in disorderly conduct, had not abused any substances, and had not violated any of the Rules and Policies for Franklin Pride. (Id. ¶ 63). Rather, Officer Spry testified that the only reason he placed Cocchini under arrest was because the event coordinator told him that she wanted Cocchini

removed from the Park. (Id. ¶ 64). At the conclusion of the State's proof at the preliminary hearing, Judge Taylor dismissed the criminal trespass warrant against Cocchini. (Id. ¶ 65).

## II. DISCUSSION

Officer Spry moves to dismiss two of Cocchini's three claims: his § 1983 First Amendment claim (Count I), and his § 1983 Fourteenth Amendment Equal Protection Clause claim (Count II).[3] (Doc. Nos. 40, 41). The Court will address each in turn.

### A. Legal Standard

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "the complaint must include a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" Ryan v. Blackwell, 979 F.3d 519, 524 (6th Cir. 2020) (quoting Fed. R. Civ. P. 8(a)(2)). When determining whether the Complaint meets this standard, the Court must accept all the Complaint's factual allegations as true, draw all reasonable inferences in Cocchini's favor, and "take all of those facts and inferences and determine whether they plausibly give rise to an entitlement to relief." Doe v. Baum, 903 F.3d 575, 581 (6th Cir. 2018); see also Ashcroft v. Iqbal, 556 U.S. 662, 678–79 (2009). The Court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether Cocchini can ultimately prove the facts alleged. Swierkiewicz v. Sorema N.A., 534 U.S. 506, 511 (2002) (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)). And "[w]hile the complaint does not need detailed factual allegations, a

---

[3] While Officer Spry contends that Cocchini's request for declaratory relief "does not affect the Court's qualified immunity analysis," he fails to consider that it is a separate, stand-alone claim. For instance, Officer Spry does not address whether the Court should elect to exercise jurisdiction over Cocchini's declaratory judgment claim pursuant to the Grand Trunk factors (see Doc. No. 41 at 16). See Grand Trunk W. R.R. Co. v. Consol. Rail Co., 746 F.2d 323, 326 (6th Cir. 1984). Although this omission may have posed an issue on how to handle Cocchini's declaratory judgment claim if the Court had granted Officer Spry's motion on qualified immunity grounds, because the Court declines to do so here, see infra, Sections II.B and II.C, it need not further consider Cocchini's declaratory judgment claim for the purposes of resolving this motion.

7

plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions" or "a formulaic recitation of a cause of action's elements[.]" Blackwell, 979 F.3d at 524 (internal quotations omitted) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). Moreover, in evaluating a motion to dismiss, the Court may consider the Complaint and the exhibits attached. Bassett v. Nat'l Collegiate Athletic Ass'n, 528 F.3d 426, 430 (6th Cir. 2008).

## B. Count I: Cocchini's First Amendment Claim

Officer Spry first moves to dismiss Cocchini's First Amendment claim. (Doc. No. 28 ¶¶ 89–103). To properly address Officer Spry's motion, the Court must first determine the nature of Cocchini's First Amendment claim. See Thaddeus-X v. Blatter, 175 F.3d 378, 388 (6th Cir. 1999) ("First Amendment law is particularly context-driven."). Cocchini's First Amendment claim is grounded in the theory that his arrest impeded his "constitutional rights of free speech and assembly." (Id. ¶ 97). However, Cocchini does not aid the Court in clarifying how Officer Spry violated his First Amendment rights. For instance, Cocchini argues in supplemental briefing that he "alleges a *prima facie* claim for First Amendment retaliation," (see Doc. No. 49 at 4), but his opening responsive brief does not argue that retaliation for his exercise of speech, nor does it cite to or apply the elements of a First Amendment retaliation claim. (See generally Doc. No. 43). Nor is it evident that the Complaint pleads as much.[4] (See Doc. No. 28 ¶¶ 89–103 (referring to "facial content and viewpoint discrimination" First Amendment claim)). Rather, the Court understands

---

[4] Cocchini's supplemental briefing aside (Doc. No. 49), his responsive brief (Doc. No. 43) and the Complaint (Doc. No. 28) both fail to describe Officer Spry's conduct as an "adverse action," and lack discussion of a "causal connection" between that action and Cocchini's speech, as is required to properly establish a First Amendment retaliation claim. See DeCrane v. Eckhart, 12 F.4th 586, 593 (6th Cir. 2021) (To establish a First Amendment retaliation claim, a plaintiff must show three elements: "that the First Amendment protected the [speech], that [the defendant] took an adverse action against [the plaintiff], and that a causal connection existed between the [speech] and the [defendant's adverse] action."). Accordingly, the Court need not further consider Cocchini's belated assertion that he raises a retaliation claim.

8

that Cocchini argues, and the Complaint alleges, that Officer Spry discriminated against him by impermissibly regulating his speech conducted in a public forum by arresting him at Franklin Pride.  (Doc. No. 28 ¶¶ 89, 92, 96–101 (pleading facts pertaining to the forum and justification analyses, and relying on First Amendment cases that do not involve retaliation claims); see generally Doc. No. 43 (same)).  Further, Count I is entitled "42 U.S.C. § 1983 First Amendment Free Speech Facial Content and Viewpoint Discrimination."  (Doc. No. 28 at PageID No. 163).

Having properly identified Cocchini's First Amendment discrimination claim, the Court moves to Officer Spry's contention that Cocchini's First Amendment claim fails because Officer Spry is entitled to qualified immunity.  (Doc. No. 41 at 7–13).  "Qualified immunity, if it applies, is a defense not just against liability, but against suit itself."  Johnson v. Moseley, 790 F.3d 649, 653 (6th Cir. 2015) (internal citation omitted).  Because Officer Spry has raised the qualified immunity defense, Cocchini bears the burden of showing Officer Spry is not entitled to qualified immunity here.  Reilly v. Vadlamudi, 680 F.3d 617, 623 (6th Cir. 2012).  In doing so, Cocchini must satisfy both steps of the qualified immunity inquiry.  Crawford v. Tilley, 15 F.4th 752, 762 (6th Cir. 2021).  "At the pleading stage, this burden is carried by alleging facts [(1)] plausibly making out a claim that the defendant's conduct violated a constitutional right [(2)] that was clearly established law at the time, such that a reasonable officer would have known that his conduct violated that right."  Johnson, 790 F.3d at 653 (citing Wesley v. Campbell, 779 F.3d 421, 428 (6th Cir. 2015)).  Further, "the allegations must demonstrate that . . . [Officer Spry] *personally* violated plaintiff's rights under clearly established law."  Johnson, 790 F.3d at 653 (internal citations omitted).  If Cocchini cannot carry this burden, Officer Spry "is entitled to dismissal before the commencement of discovery."  Mitchell v. Forsyth, 472 U.S. 511, 526 (1985) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).

For the purposes of his motion, Officer Spry does not challenge the first prong of the qualified immunity analysis. (Doc. No. 41 at 19). Instead, Officer Spry relies exclusively on the second prong, arguing that he did not violate a clearly established right of Cocchini's because he relied in good faith on his superiors' instructions to arrest Cocchini. (Id. at 9). Despite Officer Spry's concession on the first prong of the qualified immunity analysis, Cocchini bears the burden of successfully pleading facts on both prongs of the qualified immunity analysis for his First Amendment discrimination claim to survive. See Reilly, 680 F.3d at 623; Johnson, 790 F.3d at 653. Accordingly, the Court will evaluate both prongs of the qualified immunity analysis below.

### 1. Whether There Was a Violation of a Constitutional Right

The Court turns to the first prong of the qualified immunity analysis, whether Cocchini has sufficiently pled facts plausibly establishing that Officer Spry violated one of Cocchini's constitutional rights. See Reilly, 680 F.3d at 623; Johnson, 790 F.3d at 653. As discussed above, see supra, Section II.B, Cocchini brings a First Amendment discrimination claim against Officer Spry, alleging Officer Spry discriminated against him by impermissibly regulating his access to the Park based on the content and viewpoint of his speech.[5] (Doc. No. 28 ¶¶ 89–103).

"The First Amendment offers sweeping protection that allows all manner of speech to enter the marketplace of ideas." Bible Believers v. Wayne Cty., 805 F.3d 228, 243 (6th Cir. 2015) (en banc). To determine whether Cocchini adequately pled that Officer Spry violated his First

---

[5] The Complaint alleges that Officer Spry committed context and viewpoint discrimination. (Doc. No. 28 ¶¶ 89–103). As the Sixth Circuit has instructed, "[t]here is a distinction between content-based and viewpoint discrimination, but that distinction becomes salient when the speech is restricted in a non-public forum." McGlone v. Metro. Gov't of Nashville, 749 F. App'x 402, 405 n.1 (6th Cir. 2018). However, because Officer Spry concedes the first prong of the qualified immunity analysis, and the Court finds that Cocchini has sufficiently alleged that the Park was a traditional public forum, the distinction here between viewpoint and content discrimination is "a distinction without a difference." Id. Accordingly, for the sake of simplicity, the Court will refer only to content discrimination in its opinion.

Amendment rights, the Court must consider: (1) "whether [Cocchini's] conduct is protected speech"; (2) "the nature of the forum"; and (3) "whether the justifications for exclusion from the relevant forum satisfy the requisite standard." Saieg v. City of Dearborn, 641 F.3d 727, 734–45 (6th Cir. 2011) (internal citations and quotations omitted). Further, to establish his First Amendment discrimination claim under § 1983, Cocchini must also allege facts sufficient to show that Officer Spry deprived Cocchini of his First Amendment rights under color of state law. Flagg Bros., Inc. v. Brooks, 436 U.S. 149, 155–56 (1978). Here, Officer Spry properly concedes for the purpose of this motion that Cocchini engaged in protected speech through his "religious expression and ministry outreach," and that Officer Spry acted under the color of state law when he arrested Cocchini. (Doc. No. 41 at 6, 9). The Court finds sufficiently factual allegations to support those two concessions, so the Court will only address the second and third prongs of Cocchini's First Amendment discrimination claim.[6]

### a. The Nature of the Forum

As the parties, and the Court, agree that Cocchini engaged in protected speech, the next step of the First Amendment analysis is to determine the nature of the forum, because "the extent to which the Government may limit access depends on whether the forum is public or nonpublic." Saieg, 641 F.3d at 734 (internal citation and quotations omitted). "There are four types of speech fora: nonpublic, public, designated public, and limited public." Hartman v. Thompson, 931 F.3d 471, 478 (6th Cir. 2019) (citing Pleasant Grove City v. Summum, 555 U.S. 460, 469–70 (2009)

---

[6] Officer Spry contends that the Court need not resolve whether Cocchini has sufficiently pled the second and third prong of his First Amendment claim, as that analysis "is not required in order to determine whether Officer Spry" is "entitled to qualified immunity." (Doc. No. 41 at 9). That may have been true if Officer Spry's qualified immunity argument succeeded. Given that it does not, see infra, Section II.B.2, the Court finds it prudent to address all elements of Cocchini's claim, given it is his burden to counter Officer Spry's assertion of qualified immunity. See Reilly, 680 F.3d at 623; Johnson, 790 F.3d at 653.

11

and <u>Miller v. City of Cincinnati</u>, 622 F.3d 524, 534–35 (6th Cir. 2010)).  Cocchini asserts that his speech took place in a traditional public forum.  (Doc. No. 43 at 12).  While Officer Spry does not explicitly argue this point of the qualified immunity analysis, he does repeatedly note that his superiors instructed him that the Park constituted a "private, nonpublic forum" during Franklin Pride, and that he treated it as such.  (Doc. No. 41 at 2, 8).

"Traditional public fora are defined by the objective characteristics of the property, such as whether, 'by long tradition or my government fiat,' the property has been 'devoted to assembly and debate.'"  <u>Ark Educ. Television Comm'n v. Forbes</u>, 523 U.S. 666, 677 (1998) (quoting <u>Perry Educ. Ass'n v. Perry Local Educators' Ass'n</u>, 460 U.S. 37, 45 (1983)).  "[T]o determine whether a public place constitutes a traditional public forum, we must look to the purpose of the forum and whether it has been customarily used for communication and assembly."  <u>Parks v. City of Columbus</u>, 395 F.3d 643, 648–49 (6th Cir. 2005).  Whether a forum is considered a public forum "hinges on a case-by-case inquiry in which no single factor is dispositive."  <u>United Church of Christ v. Gateway Econ. Dev. Corp. of Greater Cleveland</u>, 383 F.3d 449, 453 (6th Cir. 2004).

It is well-established that public parks, such as the Park, are traditional public forums. <u>United States v. Grace</u>, 461 U.S. 171, 177 (1983) ("It is also true that 'public places' historically associated with the free exercise of expressive activities, such as streets, sidewalks, and parks, are considered, without more, to be 'public forums.'"); <u>Hague v. Comm. for Indus. Org.</u>, 307 U.S. 496, 515 (1939) (streets and parks "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions"); <u>Jobe v. City of Catlettsburg</u>, 409 F.3d 261, 266 (6th Cir. 2005) (the "traditional public forum" consists of "public streets and parks").  As the D.C. Circuit has aptly explained,

12

The dispositive question is not what the forum is *called,* but what *purpose* it serves, either by tradition or specific designation. What makes a park a traditional public forum is not its grass and trees, but the fact that it has "immemorially been held in trust for the use of the public and, time out of mind, ha[s] been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." Perry Educ. Ass'n, 460 U.S. at 45 (internal quotation marks omitted); cf. United States v. Kokinda, 497 U.S. 720, 727 (1990) (plurality) (cautioning that "[t]he mere physical characteristics of the property cannot dictate forum analysis" and holding that sidewalk abutting a Post Office was not a public forum).

Boardley v. U.S. Dept. of Interior, 615 F.3d 508, 515 (D.C. Cir. 2010).

Notwithstanding the non-exclusive Park permit granted to Franklin Pride TN (Doc. No. 28 ¶ 69 (the Park remained open to the public during Franklin Pride)), the Court must determine whether the Park "remained a traditional public forum" in this specific instance.[7] Parks, 395 F.3d at 649; see United Church of Christ, 383 F.3d at 453 (forum analysis is a case-by-case inquiry). Here, Cocchini has alleged facts plausibly demonstrating that the Park remained a public forum throughout Franklin Pride. The Complaint sufficiently alleges that, despite Franklin Pride TN's permit to use the Park for Franklin Pride, the Park remained a place for the public to assemble and discuss ideas and questions. See Hague, 307 U.S. at 515. For instance, the Complaint alleges that: the Application described Franklin Pride as a "free one-day family friendly festival with food trucks, two stages of live music/entertainment, vendor booths, nonprofit booths, a youth activity and a teen activity area, picnic area, and a beer tent." (Doc. No. 28 ¶¶ 68–69). The Application's description of Franklin Pride proved true in practice, as: Franklin Pride TN did not charge an

---

[7] While the parties frequently discuss Franklin Pride TN's "permit" for use of the Park during Franklin Pride, the Complaint does not contain any allegations indicating the City of Franklin actually granted Franklin Pride TN a permit to use the Park based on its Application. (See generally Doc. No. 28). However, the Court can reasonably infer that is indeed the case, as the Complaint sufficiently alleges Franklin Pride TN held Franklin Pride on the day, and at the location, described in the Application. (See id. ¶¶ 23, 29, 68).

admission fee for the event (id. ¶ 6); the event remained open to the public, including children (id. ¶ 69); and Cocchini interacted with booth attendants from Americans United and the Glendale United Methodist Church, as well as food vendors such as "Kookie Now by Donna." (Id. ¶¶ 31–32, 34). Under these circumstances, the Park, while subject to Franklin Pride TN's permit for Franklin Pride, undoubtedly continued to serve as a place of "assembly, communicating thoughts between citizens, and discussing public questions," demonstrating its public nature. Boardley, 615 F.3d at 515.

Officer Spry suggests the contrary, reasoning that the Park became a limited, or private, forum when Franklin Pride TN obtained a permit for the space to express its "clear message" at Franklin Pride. (Doc. No. 41 at 13). In doing so, Officer Spry relies on Hurley v. Irish-American Gay, Lesbian and Bisexual Grp. of Boston, 515 U.S. 557 (1995) in support. (Doc. No. 41 at 12–13). In Hurley, the Irish-American Gay, Lesbian, and Bisexual Group of Boston ("GLIB") sued the St. Patrick's Day parade private organizers after they did not permit the GLIB to participate as a parade unit. Id. at 560–64. The Supreme Court held that the state courts' order requiring the GLIB's participation in the parade violated the parade organizers' First Amendment rights because the order "essentially requir[ed] [the organizers] to alter the expressive content of their parade." Id. at 572–73.

Officer Spry's reliance on Hurley is unconvincing and is distinguishable from the matter at hand. Instead, the Sixth Circuit's opinion in Parks is more applicable. Parks, 395 F.3d at 649. In Parks, a festivalgoer brought a First Amendment claim against the City of Columbus after it removed him from an arts festival after he "wore a sign communicating a religious message and distributed religious leaflets." Id. at 654. There, the Sixth Circuit rejected the district court's finding that "streets which are part of the festivals become a limited public forum as the city

intended to create at most a limited public forum and had the power to do so." Id. at 649. The Parks court reasoned that the streets of the festival remained a public forum, despite the art festival's permit, given the festival did not have an expressive message. Id. at 651. The Sixth Circuit in Parks further reasoned that even if the festival had an expressive message, the religious festivalgoer did nothing to prevent any such "collective message" from being conveyed, and was therefore not seeking "inclusionary" speech in a way that altered another's free speech rights. Id.

The same is true here. Unlike the GLIB's inclusion in the parade in Hurley, which necessarily changed the expressive nature of the parade and infringed on the parade organizers' rights, here, Cocchini did not "seek inclusion in the speech of another group" that had a clearly expressive message. Parks, 395 F.3d at 652. Despite Officer Spry's contention that Franklin Pride had a "clear message," the exact content of that message is unclear. (Doc. No. 41 at 13). In fact, Franklin Pride TN expressed various objectives of Franklin Pride—to "uplift, educate and present positive images that help maintain a healthy, productive and visionary community," (Doc. No. 28 ¶ 22), to prevent "proselytiz[ing] for any reason their religion, their politics, their lifestyle," (id. ¶ 70), and to provide "unconditional acceptance of the LGBTQ person." (Id. ¶ 73). Regardless of whether these ideas expressed by Franklin Pride TN communicated a "collective message" or merely the "purpose for the event," that does not change the nature of the forum here. What matters is that the allegations in the Complaint demonstrate that Cocchini was "merely another attendee of [Franklin Pride]," walking around the Park, Parks, 395 F.3d at 651, and remained "quiet" and "peaceful" at all times. (Doc. No. 28 ¶¶ 31–34, 38). There are no allegations in the Complaint that Cocchini interfered with or prevented Franklin Pride's "message" from being conveyed, or expressed his religious beliefs in a way that interfered with Franklin Pride's message, such that he

15

sought inclusionary speech that infringed on another's rights. See Parks, 395 F.3d at 651. Accordingly, the Court is not swayed by Officer Spry's reliance on Hurley here.

The Court's "forum analysis is not completed merely by identifying the government property at issue." Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 801 (1985). It must also look to "the access sought by the speaker." Id. "When speakers seek general access to public property, the forum encompasses that property." Id. Like the plaintiff in Parks, Cocchini "sought general access to public property and was not seeking to be included in any collective message of the permit holder." Parks, 395 F.3d at 652. As just discussed, Franklin Pride was not a private event. (Doc. No. 28 ¶ 69). Rather, the Application indicates that Franklin Pride obtained its permit for a "free one-day family friendly festival" with the understanding that "*anyone entering the park* on June 3 will enter knowing they are attending Franklin Pride." (Id. ¶ 68) (emphasis added). Cocchini merely sought to access the public Franklin Pride festival and speak with other festivalgoers, like all other attendees.

Like the City of Columbus in Parks, Officer Spry cannot claim that "one's constitutionally protected rights disappear because a private party is hosting an event that remained free and open to the public." Parks, 395 F.3d at 652. Here, Cocchini sufficiently alleges facts plausibly indicating that he attempted to exercise his First Amendment free speech rights at Franklin Pride, an event free and open to all, that was held in the Park in the City of Franklin. Under these circumstances, the Complaint plausibly alleges that the Park remained a traditional public forum, notwithstanding the permit that was issued to Franklin Pride TN. See id. (arts festival held on the streets of Columbus remained a traditional public forum, despite a private party's permit, given the festival was free and open to the public); see also McGlone v. Metro. Gov't of Nashville, 749 F. App'x 402, 409 (6th Cir. 2018) (preachers bringing First Amendment claims did not hinder

Pride Festival's message "except by disturbing a desired 'safe space' by being physically present within the permitted area").[8]

### b. Justifications for Exclusion

Having determined the Park remained a public forum during Franklin Pride, the Court must next consider whether the Complaint plausibly alleges that "the justifications for exclusion from the relevant forum satisfy the requisite standard." Cornelius, 472 U.S. at 797. "Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." Id. at 799–800. Still, traditional public fora "have been devoted to assembly and debate, [therefore,] the rights of the state to limit expressive activity are sharply circumscribed." Parks, 395 F.3d at 653 (quoting Perry, 460 U.S. at 45). In quintessential public forums, such as the Park, "[f]or the state to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." Parks, 395 F.3d at 653. "The state may also enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." Id. (collecting cases).

To determine the requisite standard to evaluate Officer Spry's actions under (i.e., whether Officer Spry excluding Cocchini from the Park was content-based, or content-neutral), the Court

---

[8] Even if the Court were to conclude that the City of Franklin granting Franklin Pride TN a permit for the Park that deemed the Park a limited forum, and that the City of Franklin had the authority to do so, as long as the Park "retain[ed] the open character of the facility," it was "bound by the same standards as apply in a traditional public forum." Perry, 460 U.S. at 46. Given the Complaint sufficiently alleges that the Park remained open to the public during Franklin Pride, Officer Spry was bound by the same standards that apply to traditional public forums when he engaged with Cocchini at Franklin Pride.

must again consider the unique nature of Cocchini's First Amendment discrimination claim. As an initial matter, it is difficult to discern what rule Cocchini challenges as violating the First Amendment. A fair reading of the Complaint could find that Cocchini bases his First Amendment discrimination claim on Franklin Pride TN's Application and/or permit, as applied to him, or Franklin Pride TN's "blanket prohibition" on "proselytiz[ing] for any reason their religion[.]" (Doc. No. 28 ¶¶ 1–2, 100). Regardless, <u>Parks</u> is again instructive here. Like the festivalgoer's claim in <u>Parks</u>, here, the Court is "not faced with a challenge to the [Application or permit] in and of itself being an unconstitutional time, place, or manner restriction of [Cocchini's] speech." <u>Parks</u>, 395 F.3d at 653. Cocchini asserts that Officer Spry is attempting to avoid liability by hiding behind Franklin Pride TN, which he asserts had the discretion to exclude whomever it wanted to. (Doc. No. 28 ¶¶ 42, 43, 54, 57). The Complaint alleges that Officer Spry did so as a means of executing Franklin Pride TN's "intolerance against others because they engaged in peaceful expression of views that Franklin Pride found inconsistent with its message of gay and lesbian culture and lifestyle." (<u>Id.</u> ¶ 96).

There are two competing stories for Cocchini's exclusion from the Park. Officer Spry says he removed Cocchini from the public forum, causing him to cease his peaceful invited religious speech, apparently for violating Tennessee's criminal trespass law. (<u>Id.</u> ¶¶ 47–48). However, the Complaint alleges that Officer Spry told Cocchini on the day of his arrest, and under oath, that he arrested Cocchini because a Franklin Pride TN security event coordinator wanted him removed. (<u>Id.</u> ¶¶ 42, 43, 47, 64). Taking the allegations in the Complaint as true, Cocchini sufficiently asserts that the justification for his exclusion from the Park, and arrest, was based on the content of his speech. To start, the Complaint alleges that during Franklin Pride, Cocchini was acting in a peaceful manner. (<u>Id.</u> ¶¶ 31–33, 38). In fact, the Complaint alleges no clear difference in behavior

between him and other patrons. He was not the only person wearing clothing communicating a religious message, nor was he the only individual discussing religion. (See, e.g., id. at ¶ 34 (Glendale United Methodist Church had a booth at the event); ¶ 37 (woman at the Glendale United Methodist Church booth wore a t-shirt indicating religious affiliation); ¶ 38 (Cocchini discussed religion with two women at the Glendale United Methodist Church booth)).

Further, despite Officer Spry's contention that he "treat[ed] everyone the same," (Doc. No. 41 at 12), the Complaint alleges otherwise. While there were various people at Franklin Pride discussing or representing their religious beliefs, only Cocchini was arrested while doing so. (See Doc. No. 28 ¶¶ 34, 37, 38). When Officer Spry commanded Cocchini to leave the Park, he told Cocchini that Carillo did not want Cocchini there, but provided no explanation on why. (Id. ¶¶ 42–43, 64). And, while McNamra indicated that there would be no proselytizing at Franklin Pride (id. ¶ 70), there are no allegations in the Complaint indicating that Franklin Pride had a prohibition on religious expression in general. (See id. ¶¶ 68, 70, 73). In fact, the allegations that the Glendale United Methodist Church had a booth at Franklin Pride indicates to the contrary. (Id. ¶ 34).

These facts, again, mirror those in Parks, where the festivalgoer was removed from an arts festival for distributing religious leaflets, despite being given no explanation for his removal and the festival having no prohibition on the distribution of literature at the event. Parks, 395 F.3d at 654. There, the Sixth Circuit found it was "difficult to conceive that [the plaintiff's] removal was based on something other than the content of his speech." Parks, 395 F.3d at 654. The same rings true here. Given that the Application and Franklin Pride TN's representatives' statements did not indicate there was a blanket prohibition on religious expression at Franklin Pride, and Cocchini acted in a peaceful manner at the event, the Complaint sufficiently alleges that Officer Spry arrested him based on the religious content of his speech, "and not by any purported criminal

19

trespass." Logsdon v. Hains, 492 F.3d 334, 346 (6th Cir. 2007) (plaintiff sufficiently alleges officers were motivated by the content of his speech in removing him from a public forum, and not by any purported criminal trespass); see Parks, 395 F.3d at 654.

Having determined that Cocchini was excluded from Franklin Pride based on the content of his speech, the Court must next determine whether Officer Spry's action regulating Cocchini's speech was "necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." Perry, 460 U.S. at 45. Because Officer Spry has not offered an interest—let alone a compelling one—for the purposes of his motion here, the Court's analysis is brief.[9] (See generally Doc. No. 41). The Complaint repeatedly alleges that Officer Spry arrested Cocchini at the direction of Franklin Pride TN. (Doc. No. 28 ¶¶ 42, 43, 64). If the arrest was to "avoid offense to gay, lesbian, or transgender individuals," as the Complaint alleges, such an interest (compelling or not) is not narrowly tailored by arresting individuals like Cocchini who express religious views. To the extent Officer Spry argues that his actions were on account of his superiors' briefing, it is unclear what compelling interest the rules discussed in that briefing were intended to promote. (See generally Doc. No. 41). Accordingly, when read in the light most favorable to Cocchini, the Complaint plausibly alleges that Officer Spry, without a compelling justification, violated Cocchini's First Amendment rights by arresting him based on the content of his speech at Franklin Pride.

---

[9] Because of this omission, the Court's holding would not change even if the Complaint alleged that Cocchini's exclusion from the Park was based on content-neutral grounds. See Saieg, 641 F.3d at 734 ("If a rule is content-neutral, then the appropriate test is intermediate scrutiny, even when the rule governs speech in a traditional public forum.") (internal citation and quotations omitted). Applying intermediate scrutiny here, the Complaint alleges facts plausibly indicating there was no "significant government interest" justifying the regulation of Cocchini's speech at the Park. See Parks, 395 F.3d at 653.

20

## 2. Whether the Right Was Clearly Established

The Court now turns to the second prong of the qualified immunity analysis. Despite Cocchini sufficiently alleging that Officer Spry participated in constitutionally impermissible conduct when he arrested Cocchini, Officer Spry may "nevertheless be shielded from liability for civil damages if [his] actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Hope v. Pelzer, 536 U.S. 730, 739 (2002) (quoting Harlow, 457 U.S. at 818). "For a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Hope, 536 U.S. at 739 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, see Mitchell, 472 U.S. at 535 n. 12; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." Anderson, 483 U.S. at 640; see Harcz v. Boucher, 763 F. App'x 536, 542 (6th Cir. 2019) ("To violate a clearly established right, courts 'do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.'") (quoting al-Kidd, 563 U.S. at 741).

In addressing this prong of the qualified immunity analysis, courts assess the "'objective legal reasonableness' of the allegedly unlawful action 'in light of the legal rules that were clearly established at the time it was taken.'" Hall v. Navarre, 118 F.4th 749, 759 (6th Cir. 2024). In doing so, courts must ask whether "Supreme Court precedent as well as that of the circuit courts" "'placed the . . . constitutional question beyond debate.'" Id. (quoting al-Kidd, 563 U.S. at 741). "If *no* reasonably competent officer would have taken the same action, then qualified immunity should be denied; however, 'if officers of reasonable competence could disagree on [the legality of the action], immunity should be recognized.'" Humphrey v. Mabry, 482 F.3d 840, 847 (6th Cir. 2007) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)). Under this standard, "[q]ualified

21

immunity leave government authorities 'ample room for mistaken judgments.'" Humphrey, 482 F.3d at 847 (quoting Scott v. Clay County, 205 F.3d 867, 873 n.9 (6th Cir. 2000)). Indeed, the "doctrine protects 'all but the plainly incompetent or those who knowingly violate the law.'" Humphrey, 482 F.3d at 847 (quoting Malley, 475 U.S. at 341)).

Notably, Officer Spry does not contest that barring Cocchini from the Park based on his speech simply because the event organizers asked him to do so was a clearly established violation of the First Amendment (Doc. No. 41 at 9–13). Parks, 395 F.3d at 652. Indeed, it is. Ultimately, "[i]t has long been the case that content-based regulations of the citizen's right to engage freely in speech in quintessential public fora presumptively violate the First Amendment." Logsdon, 492 F.3d at 346; see Perry, 460 U.S. at 46 ("The First Amendment generally prevents government from proscribing speech . . . because of disapproval of the ideas expressed. Content-based regulations are presumptively invalid.") (internal citations omitted). At the time of Cocchini's arrest, the law was clearly established that individuals are free to speak about discordant views in public forums, such as the Park, so long as they remain peaceful and do not disrupt the permitted event's message. Parks, 395 F.3d at 652; see supra, Section II.B.1. In this circumstance, "[t]he contours of the First Amendment public forum doctrine [were] sufficiently clear." Logsdon, 492 F.3d at 346.

Instead, Officer Spry contends that Cocchini cannot carry his burden on the second prong of the qualified immunity analysis because it was not clearly established that Officer Spry was not "plainly incompetent" when he relied in good faith on the report of his superior officers when arresting Cocchini (Doc. No. 41 at 10). See Humphrey, 482 F.3d at 847. In support, Officer Spry asserts that, as the Complaint alleges, he reasonably relied on briefing from his superiors to remove individuals at Franklin Pride TN's instruction, and that the Park was private property for the purposes of Franklin Pride. (Doc. No. 41 at 11). Cocchini disagrees, arguing that Officer Spry

22

invokes "similar" reliance on his superiors' orders that German officials and military leaders did in asserting the Nuremberg Defense—an explanation for improper conduct that has been rejected by a range of circuit courts. (Doc. No. 43 at 8–10). Inflammatory as Cocchini's argument may be (Doc. No. 45 at 1), the Court agrees with him that Officer Spry's reliance on his superiors' orders to demonstrate his actions were not "plainly incompetent" does not entitle him to qualified immunity here.

Cocchini is correct that mere reliance on a superior's orders does not absolve Officer Spry of liability. See, e.g., Kennedy v. City of Cincinnati, 595 F.3d 327, 337 (6th Cir. 2010), cert. denied, 562 U.S. 832 (2010) ("Under the Supremacy Clause, public officials have an obligation to follow the Constitution even in the midst of a contrary directive from a superior or in a policy.") (internal citations and quotations omitted); Thaddeus-X, 175 F.3d at 393 ("[r]eliance on a superior's orders does not in itself dissipate all liability") (internal citations omitted). Even considering that Officer Spry argues not that he could blindly rely on his superiors' orders, but that he did so "in good faith," such argument fails with his improper reliance on Fourth Amendment case law, particularly Humphrey and its progeny. (Doc. No. 41 at 9–11).

Humphrey instructs that "[i]n a situation . . . where the constitutional violations are based on the *collective* knowledge of a number of police officers, it is important to recognize that an individual officer is still entitled to qualified immunity if an objectively reasonable officer in the same position could have reasonably believed that he or she was acting lawfully." Humphrey, 482 F.3d at 847. The Sixth Circuit in Humphrey further clarifies: "[m]ore specifically, where individual police officers, acting in good faith and in reliance on the reports of other officers, have a sufficient factual basis for believing that they are in compliance with the law, qualified immunity is warranted, notwithstanding the fact that an action may be illegal when viewed under the totality

23

of the circumstances." Id.  Notably, courts applying the good faith reliance doctrine in Humphrey largely do so in the context of evaluating the reasonableness of an officer's actions using the probable cause analysis in Fourth Amendment claims.  See, e.g., Harris v. Klare, 902 F.3d 630, 637–38 (6th Cir. 2018) (applying the collective knowledge limitation doctrine in the context of a traffic stop and investigation); Northrup v. City of Toledo Police Dept., 785 F.3d 1128, 1134 (6th Cir. 2015) (applying the doctrine in the context of a stop and frisk arrest); Brown v. Lewis, 779 F.3d 401, 413 (6th Cir. 2015) (applying the doctrine in the context of a car stop); Phillips v. Blair, 786 F. App'x 519, 528 (6th Cir. 2019) (applying the doctrine in the context of an obstruction arrest).  The same is true for the cases Officer Spry relies on in support of his argument (Doc. No. 41 at 10).  See Dorsey v. Barber, 517 F.3d 389, 395–96 (6th Cir. 2008) (applying the Humphrey doctrine to Fourth Amendment claims); Burgess v. Bowers, 2019 WL 13240990, at *2 (E.D. Tenn. June 25, 2019) (discussing good faith exception in the context of Fourth Amendment claim); Bluedorn v. Wojnarek, 2008 WL 4791540, at *3, *6 (M.D. Tenn. Oct. 29, 2008) (relying on Dorsey in discussing Fourth Amendment claim).  It goes without saying that the probable cause analysis courts must consider in Fourth Amendment claims bears no relation to the First Amendment discrimination claim at issue here.  Accordingly, Officer Spry's reliance on this Fourth Amendment case law is, at best, feeble.

Despite the rationale in Humphrey mainly being discussed in the context of Fourth Amendment claims, Officer Spry points to one recent notable exception: Hall v. Navarre (Doc. No. 48 at 2).  118 F.4th 749, 763 (6th Cir. 2024).  To be sure, in Hall, the Sixth Circuit blurred the lines between First Amendment *retaliation* claims and Fourth Amendment claims, as related to the second prong of the qualified immunity analysis.  See Hall, 118 F.4th at 763.  In Hall, the Sixth Circuit found an officer following his superior's orders in making an arrest at a protest was entitled

to qualified immunity for the plaintiff's First Amendment retaliation claim.[10]  Id. at 763.  There, the officer: (1) "witnessed a group of protesters acting in ways he believed to be unlawful," and (2) the officer's superior "instructed him to issue a citation to [the plaintiff] while [another officer] was ticketing other offenders at a detention center."  Id. at 761.  However, the officer did not actually see the plaintiff protesting, nor did he see the plaintiff's specific conduct.  Id.  Nevertheless, given his observance of the protesters, the Sixth Circuit held that the officer "fairly understood that the individual to whom he was issuing the citation had been part of a [protesting] group acting unlawfully because he had been arrested."  Id.  The Sixth Circuit reasoned that the officer acted on "plausible instructions from a supervisor, commands that were not undermined by other circumstances known" to him, and so was entitled to qualified immunity on the plaintiff's First Amendment retaliation claim.  Id. (internal citation and quotations omitted).

Despite Officer Spry's insistence to the contrary, Hall significantly differs from the instant case, both legally and factually.  As just discussed, Hall deals with a First Amendment retaliation claim, which necessarily invokes a discussion of probable cause that is irrelevant to this Court's analysis of Cocchini's First Amendment discrimination claim here.[11]  See Nieves v. Bartlett, 587 U.S. 391, 405 (2019) (discussing probable cause in relation to First Amendment retaliation claim); see also supra, Section II.B (Cocchini does not plead a First Amendment retaliation claim).  For First Amendment retaliation claims only, "the precedent is mixed as to how Fourth Amendment principles inform the debate."  Hall, 118 F.4th at 762 (citing Nieves, 587 U.S. at 402 (citing Fourth

---

[10] In coming to that conclusion, it is unclear that the Sixth Circuit applies Humphrey, because it does not cite Humphrey in its analysis.  Hall, 118 F.4th at 760–63.

[11] Considering this, Officer Spry's contention that "it is helpful to view Spry's claim to qualified immunity through the lens of the Fourth Amendment, even if no Fourth Amendment claim was asserted" misses the mark.  (Doc. No. 45 at 1–2).  Accordingly, the Court need not consider his belated reply arguments invoking the Fourth Amendment here.  (See generally id.).

Amendment precedents to determine contours of First Amendment retaliation claim); id. at 415 (Gorsuch, J., concurring in part and dissenting in part) (criticizing majority opinion for "engrafting a [Fourth Amendment] requirement onto a First Amendment . . . claim"); and id. at 427 (Sotomayor, J., dissenting) (criticizing majority opinion for "hybridizing two different constitutional protections")).  Accordingly, even if Hall did apply the good faith probable cause framework in Humphrey to the second prong of the qualified immunity analysis, the Sixth Circuit undoubtedly did so with the understanding that probable cause is implicated (albeit differently) in both Fourth Amendment and First Amendment retaliation claims.  See Hall, 118 F.4th at 763 ("Again, our reasoning [evaluating the officer's actions in reference to his superior's instructions] is limited to the clearly established component of the qualified immunity analysis. And on that issue, as our respective opinions in part reflect, the precedent is mixed on how Fourth Amendment principles inform the debate.").  There is no such consideration on Cocchini's First Amendment discrimination claim here.  Therefore, there is no legal basis for the Court to extend Hall and apply its analysis to the instant case.

However, even if the Court were to apply Hall to the present case, the Complaint alleges completely different factual circumstances, so Officer Spry's argument still fails.  Hall provides the following instruction on how to consider Officer Spry's argument:

> Two poles anchor the legal framework [in evaluating the assertion that an officer was following an order]. At one end is the understanding that an officer cannot benefit from qualified immunity's shield simply by asserting that he was "following orders." Bunkley [v. City of Detriot, Michigan], 902 F.3d [552,] 563 [(6th Cir. 2018)]. At the other is the notion that qualified immunity may be warranted when "reasonable officers could conclude that they have probable cause" for their conduct "based on plausible instructions from a supervisor when viewed objectively in light of their own knowledge of the surrounding facts and circumstances." Id. at 562 (cleaned up); see also Dolbin v. Miller, 786 F. App'x 52, 58 (6th Cir. 2019); Bilida v. McCleod, 211 F.3d 166, 174 (1st Cir. 2000) ("Plausible instructions from a superior or fellow officer support qualified immunity where, viewed objectively in light of the surrounding circumstances, they

could lead a reasonable officer to conclude that the necessary legal justification for his actions exists.").

Id. at 760. In the case of Hall, the Sixth Circuit found the officer had followed "plausible instructions from a supervisor" such that qualified immunity was warranted, given the chaotic nature of the situation and the officer's observances supporting his superior's instructions for arrest. Id. at 760–61. Here, Officer Spry's reliance on his superiors' instructions was not objectively reasonable, making his defense more akin to one of just "following orders." Id. at 760.

To start, the instructions of Officer Spry's superiors informs this Court's inquiry on whether Officer Spry understood that his actions violated the First Amendment. Id. Viewing the allegations in the Complaint objectively, Officer Spry had been told by his superiors that the Park was a private event and that they were to remove individuals at Franklin Pride TN's request. (Doc. No. 28 ¶¶ 57, 64). Further, Officer Spry was instructed by Lieutenant Anderson to arrest Cocchini. (Id. ¶¶ 47–48). However, Officer Spry also knew enough information about the situation to know Cocchini's behavior did not warrant arrest. Officer Spry testified that: he did not observe Cocchini engage in criminal or wrongful conduct (id. ¶ 62); Cocchini did not engage in disorderly conduct, nor did he violate the Rules and Procedures of Franklin Pride (id. ¶ 63); and he only arrested Cocchini because the security event coordinator told him she wanted Cocchini removed from the Park (id. ¶ 64). The allegation that Officer Spry knew Cocchini did not engage in criminal conduct alone demonstrates that Cocchini has plausibly alleged that Officer Spry's superiors' instructions indicating Cocchini should be arrested were "undermined by other circumstances known" to Officer Spry at the time of Cocchini's arrest. See Hall, 118 F.4th at 761. Viewing these facts objectively, despite Officer Spry's superiors suggesting that Cocchini's arrest was warranted, no reasonable officer could have concluded that there was legal justification to arrest Cocchini

because Officer Spry had first-hand observations that Cocchini had done nothing illegal. See Bilida, 211 F.3d at 174.

Notwithstanding Officer Spry's observations, he maintains that he arrested Cocchini at the direction of his superior officers for violating Tennessee's criminal trespass law. (Doc. No. 41 at 2). However, if as Cocchini alleges, Officer Spry arrested him "because of the content of his speech," then he "acted in violation of the First Amendment in ways that should have been clear to a reasonable officer." Logsdon, 492 F.3d at 346. This is a disputed issue of fact such that "development of the factual record is [] necessary to decide whether [Officer Spry's] actions violated clearly established law." Singleton v. Kentucky, 843 F.3d 238, 242 (6th Cir. 2015); see Hart v. Hillsdale Cnty., Mich., 973 F.3d at 635 ("it is generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity" given the factual analysis required on the second qualified immunity prong). Accordingly, viewing the allegations in the light most favorable to Cocchini, Officer Spry is not entitled to qualified immunity based on the face of the Complaint. Cocchini has successfully stated a claim for a violation of his First Amendment rights against Officer Spry. Officer Spry's motion on this claim fails.

## C. Count II: Cocchini's Fourteenth Amendment Claim

The Court now turns to Officer Spry's second argument, that Cocchini's § 1983 Fourteenth Amendment claim should be dismissed. In Cocchini's Fourteenth Amendment claim, he contends that Officer Spry violated the Equal Protection Clause in treating him differently than others at Franklin Pride, based on the content and viewpoint of his speech. (Doc. No. 28 ¶ 107). Officer Spry argues that Cocchini's equal protection claim fails for several reasons, each of which the Court will address.

The Equal Protection Clause of the Fourteenth Amendment commands that "no state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend.

28

XIV, § 1. "'To state an equal protection claim, a plaintiff must adequately plead that the government treated the plaintiff disparately as compared to similarly situated persons and that such disparate treatment . . . burdens a fundamental right, targets a suspect class, or has no rational basis.'" Bible Believers v. Wayne Cnty., Mich., 805 F.3d 228, 256 (6th Cir. 2015) (quoting Ctr. for Bio-Ethical Reform, Inc. v. Napolitano, 648 F.3d 365, 379 (6th Cir. 2011) (internal citations and quotations omitted)). Here, Cocchini alleges a "class of one" equal protection claim. (Doc. No. 28 ¶ 106). A "class of one" equal protection claim is "a claim that the government has 'intentionally treat[ed] one differently from others similarly situated without any rational basis for the difference.'" Walker v. Baker, 2023 WL 6380124, at *2 (6th Cir. Sept. 27, 2023) (quoting Green Genie, Inc. v. City of Detroit, 63 F.4th 521, 527 (6th Cir. 2023)).

Officer Spry first argues that Cocchini fails to plausibly allege that Officer Spry treated similarly situated individuals different than him. (Doc. No. 41 at 14). Cocchini disagrees, arguing that he identified members of the Glendale United Methodist Church as similarly situated individuals that were treated differently than him. (Doc. No. 43 at 17). "In determining whether individuals are 'similarly situated'" in "class of one" claims, "a court should not demand exact correlation, but should instead seek relevant similarity." Bench Billboard Co. v. City of Cincinnati, 675 F.3d 974, 987 (6th Cir. 2012) (internal quotations omitted).

True, Officer Spry is correct that the Complaint does not contain any allegations explicitly identifying a "similarly situated" individual to Cocchini. However, this not what controls. The sufficiency of the allegations in the Complaint are not evaluated based on "a formulaic recitation of a cause of action's elements." Blackwell, 979 F.3d at 524 (quoting Twombly, 550 U.S. at 555). The specific wording of the Complaint aside, Cocchini has alleged facts that, taken as true, plausibly allege that similarly situated individuals were treated differently than he was at Franklin

29

Pride. Specifically, Cocchini points to Glendale United Methodist Church. (Doc. No. 43 at 17–18). Cocchini alleges that he walked up to the Glendale United Methodist Church booth with Gonzales. (Doc. No. 28 ¶ 34). There, Cocchini spoke with a booth attendant for the Glendale United Methodist Church, and a woman near the booth who was "wearing a t-shirt indicating that she was a pastor." (Id. ¶¶ 34–37). It further alleges that Cocchini entered into a "cordial, seemingly welcome conversation with them on the subject of religion[,]" yet Officer Spry only approached Cocchini and Gonzales, and only instructed them to leave the Park. (Id. ¶¶ 38, 40). Further, the Complaint alleges that Officer Spry proceeded to arrest only Cocchini—not Gonzales, or the two women at the Glendale United Methodist Church booth. (Id. ¶¶ 47–48).

Taking the allegations as true, Cocchini sufficiently alleges that Officer Spry treated the two women at the Glendale United Methodist Church booth differently than Cocchini, despite their relevant similarities. See Bench Billboard Co., 675 F.3d at 987. In all relevant respects, the two women at the Glendale United Methodist Church booth were similarly situated to Cocchini: all three attended Franklin Pride; all three did so in connection with their respective religious affiliations; and all three discussed religion at the event. (Doc. No. 28 ¶¶ 34, 36–38). The Complaint alleges that, despite these similarities between the two women and Cocchini, Officer Spry instructed only Cocchini to leave the Park, and eventually only arrested him for not doing so. (Id. ¶¶ 40, 47–48). These allegations establish that Cocchini experienced different treatment than similarly situated individuals for the purposes of the pleading stage. See Bench Billboard Co., 675 F.3d at 987.

Officer's Spry's second argument, that Cocchini cannot rely on his own fundamental rights being infringed as a basis for his "class of one" equal protection claim, is more persuasive. (Doc. No. 41 at 15). Officer Spry argues that "class of one" claims such as Cocchini's cannot be

premised on a violation of an individual's right to free speech, as that right "is adequately protected by the First Amendment." (Id. at 15–16). In response, Cocchini largely ignores Officer Spry's argument, averring that he has sufficiently plead that his First Amendment rights were burdened. (Doc. No. 43 at 17–18). Here, the Court agrees with Officer Spry. As Officer Spry notes, the Sixth Circuit has "decline[d] to extend the fundamental rights analysis to classes of one" equal protection claims. Scarbrough v. Morgan Cnty. Bd. of Educ., 470 F.3d 250, 261 (6th Cir. 2006). This is because "[t]o so extend the fundamental rights analysis would allow the Equal Protection Clause to render other constitutional provisions superfluous." Id. Herein lies the problem with Cocchini's equal protection claim—it impermissibly repackages his First Amendment claim as a "class of one" claim under the Fourteenth Amendment. See Walker v. Baker, 2023 WL 6380124, at *2 (6th Cir. Sept. 27, 2023) (finding prisoner's complaint "impermissibly repackage[d] an Eighth Amendment claim as a "class of one" claim under the Fourteenth Amendment).

All the allegations pertaining to Cocchini's equal protection claim invoke the parallel alleged violation of his First Amendment rights. In particular, the Complaint alleges that Officer Spry selectively enforced "policies, practices, customs or usages governing access to the Park . . . to erect a double standard which discriminates against the Plaintiff *based on the content and viewpoint of his speech activity*" and that such actions infringed upon Cocchini's "protected rights of freedom of expression[.]" (Doc. No. 28 ¶¶ 107–08) (emphasis added). Should there be any doubt, in his briefing, Cocchini confirms his equal protection claim relies on his First Amendment rights.[12] (Doc. No. 43 at 15 (stating that his equal protection claim is based on his "[f]reedom of

---

[12] In doing so, Cocchini relies on Bible Believers, which is inapplicable to his equal protection claim because Bible Believers did not involve a "class of one" equal protection claim. See Bible Believers, 805 F.3d at 256 (group of plaintiffs relying on free speech as the fundamental right the defendant infringed upon for equal protection claim). This is a critical distinction, as the plaintiffs

31

speech," a "fundamental right")). In this circumstance, Cocchini's right to free speech "is adequately protected by the First Amendment." Scarbrough, 470 F.3d at 261. Indeed, Cocchini adequately pleads a First Amendment discrimination claim on the same theory, see supra, Section II.B, making his invocation of the equal protection clause here duplicative. See Walker, 2023 WL 6380124, at *2 ("when a particular Amendment provides a proper source for relief, invocations of the other, less directly-applicable Amendments are inappropriate"); see also Dodson v. Wilkinson, 304 F. App'x 434, 438 (6th Cir. 2008) (invocation of Fourteenth Amendment is "conclusory and unavailing" where Eighth Amendment was appropriate avenue for prisoner's claim). Thus, Cocchini's attempt here to transform what is properly a First Amendment discrimination claim into a Fourteenth Amendment "class of one claim" fails here. Walker, 2023 WL 6380124, at *2; c.f. Scarbrough, 470 F.3d at 260–61.

To be clear, the Court does not hold that Cocchini could not allege both First Amendment and equal protection claims. Certainly, Cocchini could have brought an equal protection claim premised on the theory that Officer Spry gave him disparate treatment without any rational basis for doing so, unrelated to his free speech rights. See Green Genie, 63 F.4th at 527; Scarbrough, 470 F.3d at 260–61 (holding summary judgment precluded for defendant on class of one claim premised, in part, on disparate treatment due to the defendant's animus about plaintiff's sexuality, *not* based on a violation of plaintiff's right to freely associate). As the Sixth Circuit has opined, "the hallmark of [a 'class-of-one'] claim is not the allegation that *one individual* was singled out, but rather, the allegation of arbitrary or malicious treatment not based on membership in a disfavored class." Aldridge v. City of Memphis, 404 F. App'x 29, 42 (6th Cir. 2010). True, the

_____

there raised an equal protection claim premised on the violation of a fundamental right of a *class of people*, which is subject to strict scrutiny, unlike the "class of one" claim here. Scarbrough, 470 F.3d at 260–61.

Complaint does allege that Officer Spry's treatment of Cocchini was "arbitrary." (Doc. No. 28 ¶ 107). However, this amounts to a bare recitation of part of the standard for evaluating "class of one" equal protection claims that cannot, itself, sustain a cognizable claim. See Twombly, 550 U.S. at 555; see also Napolitano, 648 F.3d at 377 ("[V]ague and conclusory allegations of nefarious intent and motivation by officials at the highest levels of the federal government are not well-pleaded, and are therefore insufficient to plausibly suggest an entitlement to relief.") (internal citation and quotations omitted). Without alleging *how* Officer Spry's actions were arbitrary, or *why* there was no rational basis for Officer Spry's actions, the Court cannot conclude Cocchini plausibly alleges a viable equal protection claim here. (See Doc. No. 28 ¶¶ 104–09).

Without more, Cocchini has failed to plead facts sufficient to establish his equal protection claim. Walker, 2023 Wl 6380124, at *2 (affirming district court's dismissal of "class of one" equal protection claim premised on Eighth Amendment claim). Accordingly, the Court need not reach the parties' arguments on qualified immunity on this claim. Officer Spry's motion will be granted on Cocchini's equal protection claim.

## III.   CONCLUSION

For the foregoing reasons, Officer Spry's Motion to Dismiss (Doc. No. 40) will be granted in part and denied in part as to Officer Spry, and denied as moot as to Officer Yates and Lieutenant Anderson.

An appropriate order will enter.


_____
WAVERLY D. CRENSHAW, JR.
UNITED STATES DISTRICT JUDGE