**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **JOSEPH COCCHINI,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **No. 3:23-cv-01185** |
| | ) | |
| **THE CITY OF FRANKLIN,** | ) | |
| **TENNESSEE, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |
| **BRIAN RUSSELL, et al.** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | **No. 3:24-cv-00223** |
| | ) | |
| **THE CITY OF FRANKLIN,** | ) | |
| **TENNESSEE,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |
| **TIMOTHY BROWN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **No. 3:24-cv-00497** |
| | ) | |
| **THE CITY OF FRANKLIN,** | ) | |
| **TENNESSEE,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

This case arises from the alleged violations of five individual's First Amendment rights while attending and seeking to attend the Franklin Pride Festival ("Franklin Pride" or "Festival") at Harlinsdale Farm ("Park") in June 2023. After Plaintiffs Joseph Cocchini ("Cocchini"), Brian Russell ("Russell"), Marvin Young ("Young"), Jeremy Slayden ("Slayden"), and Timothy Brown

("Brown") (collectively, "Plaintiffs") were either prohibited entry, asked to leave, or removed for expressing their religious beliefs at the Festival, they filed claims for constitutional violations under 42 U.S.C. § 1983 ("§ 1983") and declaratory relief under 28 U.S.C. § 2201 against the City of Franklin, Tennessee ("City of Franklin") and, in Cocchini's case, Officer Kevin Spry ("Officer Spry") in his individual capacity (collectively, "Defendants").[1]

Now before the Court are the parties' three cross-motions for summary judgment (Doc. Nos. 61, 65, 69), which have all been fully briefed and are ripe for review (see Doc. Nos. 69–71, 73–74, 78–80, 82–83, 85–89, 92–95). Plaintiffs have also filed a Motion to Strike Affidavits of McNamara, Carillo, and Kleibrink Filed In Support of the City's Motion for Summary Judgment (Doc. No. 73), to which the City responded (Doc. No. 76), and Plaintiffs replied (Doc. No. 84).[2] For the following reasons, the Court rules as follows: Plaintiffs' Motion for Summary Judgment (Doc. No. 61), Plaintiffs' Motion to Strike Affidavits (Doc. No. 73), and Officer Spry's Motion for Summary Judgment (Doc. No. 69) will be denied; and the City's Motion for Summary Judgment (Doc. No. 65) will be granted in part and denied in part.

---

[1] The Court consolidated the cases brought by Russell, Young, Slayden, and Brown against the City with the instant case. (See Case No. 3:24-cv-00223, Doc. No. 14; Case No. 3:24-cv-00497, Doc. No. 15).

[2] Plaintiffs' Motion to Strike (Doc. No. 73) is improper, as the affidavits they seek to strike are not "pleadings" that may be subject to a motion to strike under Rule 12(f). See Fed. R. Civ. P. 12(f); see also Fed. R. Civ. P. 7(a) (defining "pleadings" to include "(1) a complaint; (2) an answer to a complaint; (3) an answer to a counterclaim designated as a counterclaim; (4) an answer to a crossclaim; (5) a third-party complaint; (6) an answer to a third-party complaint; and (7) if the court orders one, a reply to an answer."). Given this, Plaintiffs' Motion (Doc. No. 73) will be denied. See Fox v. Michigan State Police Dep't, 173 F. App'x 372, 375 (6th Cir. 2006) (upholding the district court's denial of motion to strike under Rule 12(f) where it "correctly decided not to strike the exhibits attached to defendants' dispositive motion"). Further, the Court notes its skepticism of Plaintiffs' request to reopen discovery on the three individuals that submitted affidavits, particularly considering that two of the three individuals were named in at least one of the complaints at issue. In any event, that request should be brought before the Magistrate Judge for proper consideration.

2

## I.  BACKGROUND AND UNDISPUTED FACTS[3]

Given the similarities between the three consolidated cases, the Court discusses all the undisputed facts together.  Because there are three separate cross-motions for summary judgment before the Court, some of the undisputed facts described below bind, and are only relevant to, only one of the two Defendants.  To the extent Officer Spry's responses to Plaintiffs' statements of undisputed facts mirror the City's responses, the Court cites to only one of the responses herein.  (See Doc. Nos. 79, 82).

1. Franklin Pride

Franklin Pride, TN is a Tennessee non-profit that celebrates the LGBTQ+ community and their allies.[4]  (Doc. No. 78-26 ¶ 3).  The mission of Franklin Pride, TN is to:

> [E]ducate, inform and foster community that brings together LGBTQIA+ people and their allies in a social, non-threatening and empowering setting to uplift, educate and present positive images that help maintain a healthy, productive and visionary community in Williamson County and surrounding areas . . . This purpose may be realized through the production of one or more annual events designated to celebrate pride in LGBTQIA+ individuals in a safe setting where all participants experience equality and acceptance.

(Doc. No. 78-3 at 2).  One such annual event is Franklin Pride: a festival celebration conveying inclusiveness to the LGBTQ+ community.  (Doc. No. 78-26 ¶ 6; Doc. No. 86 ¶ 16).

---

[3] These undisputed facts are drawn from the undisputed portions of the parties' responses statements of facts (Doc. Nos. 79, 82, 86–87, 89), the exhibits and depositions submitted in connection with the summary judgment briefing, and portions of the Complaints (Doc. No. 28; Case. No. 3:24-cv-00223, Doc. No. 1; Case No. 3:24-cv-00497, Doc. No. 1) that are not contradicted by the evidence in the record.

[4] Plaintiffs object to a subset of the City's and Officer Spry's statements of undisputed material facts solely on the grounds that the statements rely on affidavit evidence that should be stricken from the record.  (See, e.g., Doc. No. 86 ¶¶ 13–18; Doc. No. 89 ¶¶ 26–27).  Because the Court has already determined Plaintiffs' Motion to Strike (Doc. No. 73) is without merit, see infra, those objections are overruled.

3

On January 16, 2023, Franklin Pride, TN submitted a special event application to use the Park, a space owned by the City, for Franklin Pride on June 3, 2023. (Doc. No. 79 ¶¶ 2–3, 6; Doc. No. 86 ¶ 20). In its application, Franklin Pride, TN described the Festival as follows:

> Franklin Pride is a free one-day family friendly festival with food trucks, two stages of live music/entertainment, vendor booths, nonprofit booths, a youth activity and a teen activity area, picnic area, and a beer tent (21 and up). There will not be a drag show in the park. We will rent the entire park so anyone entering the park on June 3 will enter knowing they are attending Franklin Pride.

(Doc. No. 78-3 at 5). The City granted Franklin Pride, TN its permit request, allowing it to use the entire Park on June 3, 2023 for Franklin Pride. (Doc. No. 82 ¶ 6; Doc. No. 86 ¶¶ 10, 21, 32). It also agreed to support Franklin Pride, TN in executing and maintaining control over the Festival, (Doc. No. 79 ¶ 29), and to give Franklin Pride, TN some latitude to manage the event. (Doc. No. 86 ¶ 11). For example, to carry out the Festival, Franklin Pride, TN selected and approved vendors aligning with its LGBTQ+ inclusive message. (Doc. No. 86 ¶ 74.). Vendor materials were subject to review and exclusion if Franklin Pride, TN found them to not be in compliance with the purpose of Franklin Pride or the permit. (Id. ¶ 75). Approved vendors, including churches, paid fees to Franklin Pride to have spaces or booths at the Festival. (Id. ¶¶ 76, 77).

In return, as a permittee, Franklin Pride, TN took on its own liability for hosting Franklin Pride in the Park. For instance, Franklin Pride, TN agreed to:

> [A]ssume the defense of and indemnity and save harmless the City, it's mayor, alderman, boards commissions, officers employees, and agents from all suits, actions, damages, or claims to which the City may be subjected to any kind or nature whatsoever resulting from, caused by, arising out of, or as a consequence of such event and the activities permitted in connection therewith.

(Doc. No. 79 ¶ 8; Doc. No. 82 ¶ 8). Further, on April 19, 2023, City Administrator Eric Stuckey ("Stuckey") sent a letter to President of Franklin Pride, Clayton Klutts ("Klutts") on permit conditions, including one stating that:

4

There shall be no harassment or discrimination based on age, ancestry, color, gender identity or expression, national origin, physical or mental disability, religion, sexual orientation, or any other characteristic protected by applicable laws, regulations, and ordinances.

(Doc. No. 79 ¶ 10; Doc. No. 86 ¶ 33).

The City opted to utilized law enforcement resources for the Festival, mandating 30 Franklin Police Department ("FPD") officers work the event, with additional officers remaining on standby if needed. (Doc. No. 78-30 ¶ 13). On the morning of Franklin Pride, the City held a briefing for those police officers, emergency personnel, and other City officials to discuss the Festival. (Doc. No. 79 ¶ 19). Officers Spry, Alan Yates ("Officer Yates"), Mark Sanchez ("Officer Sanchez"), and Lieutenant Eric Anderson ("Lieutenant Anderson"), along with seventeen other FPD police officers, attended the briefing. (Id.). Attendees also included: Shauna Billingsley ("Billingsley"), counsel for the City; Lisa Clayton ("Clayton"), Parks and Recreation Director for the City; and Janey Mason ("Mason"), Parks Supervisor for the City. (Id.).

The instructions given during the briefing is, to some degree, in dispute. On one hand, Plaintiffs and Officer Spry agree that FPD officers were instructed that if Franklin Pride, TN event coordinators or safety coordinators, including event security coordinator Cathy Carrillo ("Carrillo"), wanted someone removed from the Park for any reason, they were to remove them without question. (Doc. No. 69-8 at 12:11–16 (**Q:** "So let me ask you, at that briefing, were you instructed that if the [] event coordinator or someone on behalf of Franklin Pride wanted someone removed for any reason, you were to see that they were removed?" **A:** "Yes, sir."); Doc. No. 69-9 at 13:11–5 (**Q:** "[I]f a Franklin Pride event coordinator or event safety coordinator told you they wanted someone removed, that was enough, and you had orders to remove them?" **A:** "Yes."); Doc. No. 82 ¶ 20). On the other, the City proffers evidence that it informed FPD officers that it made this instruction with the caveat that any removals must be consistent with the law, and with

5

the City's prohibition on discrimination by Franklin Pride based on religion or protected traits. (Doc. No. 69-6 at 23:15–20 (**Q:** "[I]f a Franklin Pride event coordinator or event safety coordinator told you or an officer they wanted someone removed, was that enough for the person to be removed?" **A:** "Yes. If it was consistent with the law."); Doc. No. 79 ¶ 10; Doc. No. 86 ¶¶ 20, 33). What is not in dispute, however, is that per the City's instruction, the FPD officers: (1) were to treat the permitted space as "private property" for the purposes of the Festival (Doc. No. 79 ¶ 21; Doc. No. 82 ¶ 21); and (2) were to place any individual under arrest that failed to leave the Festival voluntarily after being ordered to do so (Doc. No. 79 ¶ 22; Doc. No. 82 ¶ 22).

Later that day, Franklin Pride, TN proceeded with the Festival under its City-issued special event permit. (Doc. No. 86 ¶ 8). Franklin Pride, TN held the Festival open to the public for attendance, free of charge.[5] (Doc. No. 64-1 at 10:25–11:3; Doc. No. 79 ¶ 26; Doc. No. 82 ¶ 16). To establish the bounds of the Festival, the Park's perimeter was marked with signage, and was fenced and barricaded in. (Doc. No. 79 ¶ 46). Attendees of Franklin Pride could enter the Park through one of two controlled entry points on either the south or east sides of the Park. (Doc. No. 86 ¶ 46). The City also designated protester and counter-protester areas across the street from the Park. (Id. ¶¶ 52–53).

---

[5] Defendants contend the Festival was not "open" because it was held pursuant to a permit, relying on evidence that fails to support their argument. (See Doc. Nos. 79 ¶ 16, 82 ¶ 16 (disputing that the Festival was open to the public because Franklin Pride, TN obtained a permit and required wristbands upon entry to ensure attendees complied with Festival rules); but see Doc. No. 78-1 (stating the City "has developed guidelines for events/activities for public use of the park" and "[t]he [City's] intention is that the [Park] will be designated as a passive public park and thereafter open to the general public for educational uses and passive recreation."); Doc. No. 78-3 at 5 (Franklin Pride, TN permit application stating that it expected 5,000 "spectators/attendees" and would "rent the entire park so anyone entering the park on June 3 [would] enter knowing they are attending Franklin Pride"); Doc. No. 78-29 (Stuckey discussing a permit holder's interest in its event, but not concluding a permitted event is private)). In any event, Defendants' rationale that a permit makes an event private is inconsistent with controlling Sixth Circuit precedent. See infra.

Franklin Pride, TN required that attendees wear a wristband upon entry, (Doc. No. 86 ¶ 48), and instated rules for the Festival. For example, it barred attendees from participating in dangerous or disruptive behavior, including engaging in fighting, disorderly behavior, or using weapons or any other item that could disturb the peace or endanger others. (Doc. No. 86 ¶¶ 50, 51; Doc. No. 78-10). Any such violations would result in an attendee's ejection from Franklin Pride. (Id.). Franklin Pride, TN had also instructed on its Instagram page that it would "not allow anyone to proselytize for any reason their religion, their politics, their lifestyle" and "require[d] unconditional acceptance of the LGBTQ person." (Doc. No. 86 ¶ 17). Further, consistent with its vendor policy, Franklin Pride, TN implemented a rule that only paid vendors were permitted to distribute materials at the Festival.[6] (Doc. No. 86 ¶¶ 78–79).

### 2. Cocchini's Attendance at Franklin Pride

Cocchini is an evangelist who holds traditional Judeo-Christian views and is a member of a group called "Nashville Evangelists." (Doc. No. 79 ¶ 39; Doc. No. 86 ¶ 90). Cocchini met up with three other Nashville Evangelists—John Coble ("Coble"), Ben Gonzales ("Gonzales"), and Bradley Naslund ("Naslund")—around noon on June 3, 2023 to attend the Festival. (Doc. No. 79 ¶ 43).

As Cocchini and his fellow Nashville Evangelists approached the Park, they split into groups of two. (Doc. No. 79 ¶ 46). Cocchini paired with Gonzales and entered Franklin Pride through a secured checkpoint. (Id.; Doc. No. 86 ¶ 121). Cocchini read the rules posted by Franklin Pride, TN for those attending the Festival, and received a wristband signifying agreement to abide by them while attending. (Doc. No. 78-21 at 81:3–18; Doc. No. 86 ¶ 122). When Cocchini entered

---

[6] Strangely, Plaintiffs dispute that Franklin Pride had such a rule but admit that the City implemented it. (See Doc. No. 86 ¶¶ 78–79; see also Doc. No. 78-39 at 2:25–3:06 (telling officers during the Festival that passing out literature was prohibited)).

the Festival, he was wearing a t-shirt that read: "Jesus Changed My Life, Ask Me How," (Doc. No. 79 ¶ 45), which no one asked him to remove upon entry. (Doc. No. 86 ¶ 123).

Once in the Park, Cocchini, approached various vendors (Doc. No. 78-21 at 84:2–13, 87:1–13), passed out a single religious tract to a vendor who offered him a business card in exchange (Doc. No. 47 ¶ 48), and eventually arrived at a booth sponsored by the Glendale United Methodist Church (id. ¶ 49). As Cocchini read a sign set in front of the Glendale United Methodist Church booth, the booth attendant, Lezleigh Kleibrink ("Kleibrink"), engaged in conversation with him. (Doc. No. 78-21 at 93:1–6). Cocchini asked Kleibrink, "Are you a Christian?" and she responded "Yes." (Id. at 93:10–12). Cocchini then asked her to share her gospel so he could understand if her beliefs "aligned" with "biblical understanding." (Doc. No. 86 ¶ 134). Cocchini observed that Kleibrink seemed confused by his use of the word "gospel." (Doc. No. 78-21 at 94:22–25).

Initially, Kleibrink welcomed Cocchini's questions, and listened to Cocchini's own views about the gospel. (Doc. No. 86 ¶ 135; Doc. No. 79 ¶ 50). The nature of the conversation between Kleibrink and Cocchini from this point forward is in dispute. While Cocchini contends it remained polite and respectful (id. ¶ 51), Defendants aver that Cocchini became angry at Kleibrink's Christian views on the LGBTQ+ community and its members, interrogated Kleibrink on those views, shared information about Cocchini's past indiscretions without solicitation for such information, and forced his "Christian testimony" on her. (Doc. No. 78-28 ¶¶ 11–16.; Doc. No. 78-21 at 98:16–20 (Cocchini testifying that he always shares his sins with people, such as his past addictions to alcohol and pornography); Doc. No. 82 ¶ 51 (Officer Spry relying on the same)). It is after this interaction—however it unfolded—that Glendale Methodist Pastor Stephanie Dodge ("Pastor Dodge") approached Cocchini and Kleibrink. (Doc. No. 78-28 ¶ 18).

8

Meanwhile, Carrillo informed Officers Spry and Yates that Cocchini and Gonzales needed to be removed from Franklin Pride without giving a reason for their removal. (Doc. No. 79 ¶¶ 53–54; Doc. No. 86 ¶¶ 154–55; <u>see</u> Doc. No. 82 ¶ 57 (Officer Spry did not recall being told by Franklin Pride that Cocchini had been acting in a disorderly manner)). To this point, no one had complained to Franklin Pride staffers about Cocchini or his conduct at the Festival. (Doc. No. 79 ¶ 55). Nevertheless, following Carrillo's instruction, Officers Spry and Yates, and Lieutenant Anderson, approached Cocchini while he continued his discussion with Pastor Dodge and Kleibrink. (Doc. No. 79 ¶ 52). Officer Yates's body camera footage captured the interaction between the FPD officers and Cocchini. (Doc. No. 78-33).

Upon the FPD officers approaching Cocchini and informing him that he needed to leave Franklin Pride, Cocchini asked: "We're being removed for what reason?" (<u>Id.</u> at 0:39–0:41). In response, Officer Yates stated: "The event coordinator has asked us . . . to ask you to leave." (<u>Id.</u> at 0:42–0:45). Cocchini asked if he was being detained, to which Officer Yates responded "no." (<u>Id.</u> at 0:45–0:50). Officer Spry then instructed Cocchini: "I'm telling you, you're not being detained at this point, but what we're doing is, we're having you leave because the event coordinator has asked that you leave." (<u>Id.</u> at 0:50–0:57). Officer Spry continued: "Let me make this very clear. This is not our decision. We don't know why, we don't have anything to do with this." (<u>Id.</u> at 1:11–1:15). Officer Yates added: "You're on private property and they've asked you to leave." (<u>Id.</u> at 1:16–1:17). Cocchini asked: "So is this a public event that is unpaid for?" (<u>id.</u> at 1:17–1:20), to which Officer Yates responded: "They have rented the space." (<u>Id.</u> at 1:20–1:21). Officer Spry continued: "They have rented this space. So therefore they called and told us 'hey, these two guys—we want them removed.' So that's what we are here to do. I don't know why, I

9

don't have anything to do with that. So we need to start walking that way," gesturing towards the exit. (Id. at 1:44–1:56).

Despite the FPD officers' instructions for Cocchini to leave the Festival, he continued to stand in front of the Glendale United Methodist Church's booth. (Id.). Cocchini said: "If you give me a legal reason why I have to leave, I'll leave. If you can't. . ." (Id. at 2:08–2:12). In response, various officers warned him that if he did not leave, he would be trespassing and reminded him that the Festival was a private event. (Id. at 2:12–2:50). After failing to make any further progress, Officer Spry said: "Okay sir, discussion is over. I'm going to tell you one more time to walk with us to leave or else you are going to be arrested . . . are you going to leave or am I going to arrest you?" (Id. at 3:02–3:13). Cocchini responded: "You're going to have to arrest me sir, I'm sorry." (Id. at 3:13–3:14). Officer Spry then did so and removed Cocchini from the Park. (Id. at 3:14–3:15).

### 3. Russel's, Young's, and Slayden's Attendances at Franklin Pride

Young, Russel, and Slayden, who also hold Christian values, similarly decided to attend Franklin Pride. (Doc. No. 79 ¶¶ 69, 86, 95, 108, 102, 111). Like Cocchini, Young, Russel, and Slayden all entered the Park through a secured checkpoint and received wristbands upon entry. (Doc. No. 86 ¶¶ 162, 170).

Russel entered the Festival twice. (Doc. No. 79 ¶ 77). The first time, he entered the Park with Slayden, walked around, purchase water, prayed silently, and looked for Young. (Id. ¶¶ 77, 104). Slayden went off on his own, chatted with festivalgoers, and later left for lunch. (Id. ¶ 104). Eventually, Russel and Young met up. (Id. ¶ 89). Once Russel and Young joined, they focused their engagement with festivalgoers and vendors towards the booths in "church row," an area of the Festival with booths run by LGBTQ+ friendly churches. (Doc. No. 86 ¶ 174).

10

First, they visited the Gracepoint Methodist Church booth, where they were handed a flyer, and proceeded to question the booth attendants about their religious beliefs. (Doc. No. 79 ¶ 78; Doc. No. 86 ¶ 175). Russel captured this interaction on camera. (Doc. No. 78-37). Per Russel's recording, Russel told a booth attendant that the whole Festival was "sad," stating that "God wants to set people free. He wants to heal people from this." (Id. at 0:55–1:04). The booth attendant responded: "So you're not an ally to what's going on here?" (Id. at 1:04–1:06). In response, Russel said: "Oh absolutely not, no, no, no. We're trying to love on people, and share the truth, and believe the whole Bible, and believe God sets people free and heals people, you know?" (Id. at 1:06–1:18). Russel and the booth attendant continued to discuss the topic. (Id.). Later in the conversation, another attendant called Young a "hater." (Doc. No. 86 ¶ 176). But Young and Russel persisted (id. ¶ 177), prompting a booth attendant to yell at them to "move along" or "keep going," and that she would call the police. (Doc. No. 79 ¶¶ 78, 90). After this, Russel and Young moved on from the booth. (Id.).

A similar occurrence happened at the First Presbyterian church booth. (Doc. No. 86 ¶ 178). There, Russel challenged a booth attendant on her beliefs and confronted her about why the church had removed his signs posted on the Church's property about pre-event prayer meetings. (Id.). Shortly thereafter, Officer Sanchez approached Young and Russel. (Doc. No. 79 ¶ 79; Doc. No. 86 ¶ 181). Officer Sanchez's body camera footage captured the interaction between them. (Doc. No. 78-31).

Officer Sanchez advised Young and Russel they could not pass out literature at the Festival. (Id. at 0:41–0:44). After discussing that rule, Officer Sanchez informed them: "We got a complaint on you from someone over there," pointing behind him. (Id. at 1:06–1:10). The men discussed the circumstances surrounding the complaint, to which Officer Sanchez further stated: "I'm just

letting you guys know, you know, they talked to the organizers and [if] the organizers said you guys [have to] go, then you're [going to] have to go." (Id. at 1:26–1:33). He instructed Young and Russel that, although the Park is public property, Franklin Pride was "a private event" and that "whatever happens here, [Franklin Pride, TN] is responsible for it" because "they reserved" the Park. (Id. at 1:57–2:15). After further conversation, Officer Sanchez clarified to Russel and Young that: "Nobody has come to . . . tell you to leave," only that if the Franklin Pride organizers requested their departure, they would have to go. (Id. at 2:59–3:07).

After their interaction with Officer Sanchez, Young and Russel continued to enjoy Franklin Pride. At another booth, Young disputed with an attendant whether the booth's "queer pastor" flyer was scriptural. (Doc. No. 86 ¶ 184). Similarly, at a Methodist church booth, Russel challenged a Methodist pastor on scripture supporting homosexuality. (Id. ¶ 185). When the pastor reminded Russel that everyone sins, Russel countered the difference is "he does not throw a party to celebrate it and invite little kids to it." (Id. ¶ 186). Eventually, Young and Russel left the Methodist booth, stopped to pray with some other individuals without interference, and left the Park.[7] (Doc. No. 79 ¶¶ 99–100; Doc. No. 86 ¶ 188).

Although Young did not return to the Festival (Doc. No. 86 ¶ 189), Russel and Slayden entered Franklin Pride a second time. (Doc. No. 79 ¶¶ 80, 104). Shortly after reentering, Slayden suggested that they pray together. (Id. ¶¶ 81, 108). They prayed with two other individuals (Doc. No. 86 ¶ 193), without intrusion, "for those churches that you would rebuke those pastors that are pushing this sexual perversion." (Id. ¶ 194). After praying, FPD officers and Carrillo confronted

---

[7] Whether Young left the Park voluntarily or to "avoid being arrested" is disputed. (See Doc. No. 79 ¶ 100). Because Young testified both that he left with Russel (Doc. No. 78-23 at 124:17–21), and that he did so to avoid being arrested (id. at 131:19–22), the Court finds this sufficient to support his First Amendment claim considering his prior conversations with Officer Sanchez.

Russel and Slayden on Carrillo's instruction that they needed to leave the Park. (Doc. No. 79 ¶¶ 81, 109; Doc. No. 86 ¶ 195). Per Officer Crowe's body camera footage (Doc. No. 78-34), Carrillo informed the prayer group: "Folks are feeling uncomfortable and we want to make sure that everyone here feels welcome. Obviously the Park is . . . the permit is to the organizers and so, therefore, if you're not here in support of Pride, we are asking you all to leave." (Id. at 1:28–1:42). Russel then engaged with the FPD officers, prompting Officer Crowe to ask: "Are you [going to] leave?" (Id. at 2:30–2:32). After Russel responded that he would leave, (id. at 2:35–2:36), the FPD officers escorted him and Slayden out. (See id.; see also Doc. No. 79 ¶ 83).

### 4. Brown's Attempted Attendance at Franklin Pride

Brown, another individual who espouses traditional Judeo-Christian values, also attempted to attended Franklin Pride. (Doc. No. 79 ¶ 110; Doc. No. 86 ¶ 115). He sought to attend the Festival to minister and hand out religious tracts. (Doc. No. 79 ¶ 110). The day of the Festival, Brown and his fellow street preacher, Tom Knickerbocker ("Knickerbocker"), approached one of the Franklin Pride entry points. (Doc. No. 79 ¶¶ 110–11). Brown captured his attempted entry to Franklin Pride on his phone. (Doc. No. 78-35).

As Brown and Knickerbocker approached the Festival, a private security officer informed them that it was "a closed off event," (id. at 1:59), and they could not go farther than just before the entry point. (Id. at 2:00–2:09; see Doc. No. 86 ¶ 215). When Brown asked why they could not go in, the security officer responded: "You guys are trying to bring in outside stuff and you're obviously not here to support [Franklin Pride]." (Doc. No. 78-35 at 2:14–2:18). Brown again asked why he could not go in (id. at 2:34–2:35), to which a Franklin Pride staffer responded: "You're bringing in some outside materials and it doesn't seem like you're here to support and celebrate with us." (Id. at 2:36–2:43). Brown challenged that determination, noting that the Park

is public, to which the staffer stated: "So this is actually a public Park [] that we have reserved for the Pride festival." (Id. at 2:45–2:48). Brown, Knickerbocker, and the staffer debated whether Franklin Pride, TN could do that without charging admission. (Id. at 2:49–3:00). Then, Brown offered to take his materials "back" and "still go in." (Id. at 3:00–3:03). The private security officer, Brown, and Knickerbocker continued the conversation, where Brown questioned the private security officer's assertion that he is a Christian. (Id. at 3:30–3:58). Brown then again repeated his offer to take his "tracts back." (Id. at 3:59–4:03). Franklin Pride staffers and the private security officer still denied Brown and Knickerbocker entry to the Park. (Id.). Unsatisfied, Brown requested to speak with a FPD officer. (Doc. No. 79 ¶ 113; Doc. No. 89 ¶ 218). Officer Sanchez arrived at the scene, and captured his conversation with Brown and Knickerbocker on his body camera. (Doc. No. 78-32).

When Officer Sanchez arrived, he asked the Franklin Pride staff: "Do you guys want them here?" (Id. at 1:39–1:40). After they responded in the negative, Officer Sanchez told Brown and Knickerbocker: "They don't want you here, you guys [have got] to go." (Id. at 1:41–1:42). The three men thereafter engaged in conversation, where Officer Sanchez informed them that if they did not comply with his order, they would be arrested for criminal trespassing, given Franklin Pride was a private event and Franklin Pride staff did not want them there. (Id. at 1:42–2:06). In response, Brown requested to speak with Officer Sanchez's supervisor, Lieutenant Clayton Cates ("Lieutenant Cates"). (Id. at 2:40–2:43).

Lieutenant Cates arrived on the scene. (Id. at 5:17). He told Brown and Knickerbocker: "Whatever happened down there at the gate—the event organizers, they didn't like it. Okay. Now, they have reserved the Park, okay, and the City . . . has voted to approve this venue for their private event, okay? They have the right—whatever happened down there, if you got into it with them . .

14

. now they don't want you in." (Id. at 5:28–5:56). Lieutenant Cates then reiterated a similar statement, informing Brown and Knickerbocker that: "The event organizers, whatever you said to them, or were going to pass out, or whatever, they don't approve of it." (Id. at 6:14–6:22). Lieutenant Cates told them that they were "more than welcome to be on the sidewalk." (Id. at 6:33–6:35). He finished: "Whether or not you like it or not, I have no control over it. The event organizers don't want you over here or in the event, that's their call." (Id. at 7:12–7:22). Ultimately, Brown was denied entry to the Festival.

## II. LEGAL STANDARD

Summary judgment is appropriate only where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Peffer v. Stephens, 880 F.3d 256, 262 (6th Cir. 2018) (quoting Anderson, 477 U.S. at 249). "The party bringing the summary judgment motion has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." Rodgers v. Banks, 344 F.3d 587, 595 (6th Cir. 2003) (citation omitted). "The moving party may satisfy this burden by presenting affirmative evidence that negates an element of the non-moving party's claim or by demonstrating an absence of evidence to support the non-moving party's case." Id. (citation and quotations omitted). "In response, the nonmoving party must present 'significant probative evidence' that will reveal that there is more than 'some metaphysical doubt as to the material facts.'" Miller v. Maddox, 866 F.3d 386, 389 (6th Cir. 2017) (quoting Moore v. Philip Morris Cos., Inc., 8 F.3d 335, 340 (6th Cir. 1993)).

In deciding a motion for summary judgment, the Court must review all the evidence, facts, and inferences in the light most favorable to the party opposing the motion. Matsushita Elec.

Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted). "And where, as here, the parties filed cross-motions for summary judgment, 'the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" McKay v. Federspiel, 823 F.3d 862, 866 (6th Cir. 2016) (quoting Taft Broad. Co. v. United States, 929 F.2d 240, 248 (6th Cir. 1991)). The Court does not, however, weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. Anderson, 477 U.S. at 249. The mere existence of a scintilla of evidence in support of the non-moving party's position is insufficient to survive summary judgment; rather, there must be evidence on which a trier of fact could reasonably find for the non-moving party. Rodgers, 344 F.3d at 595.

## III. ANALYSIS

Plaintiffs assert various First and Fourteenth Amendment claims under § 1983, "which provides for the vindication of federal rights." Green v. Throckmorton, 681 F.3d 853, 859–60 (6th Cir. 2012). To survive summary judgment in a § 1983 action, Plaintiffs must each demonstrate a genuine issue of material fact "'that a person acting under color of state law deprived [them] of a right secured by the Constitution or laws of the United States.'" Id. (quoting Waters v. City of Morristown, Tenn., 242 F.3d 353, 358–59 (6th Cir. 2001)); Wurzelbacher v. Jones-Kelley, 675 F.3d 580, 583 (6th Cir. 2012). Plaintiffs assert without dispute that Defendants—clearly "person[s] acting under color of state law"—violated their constitutional rights to free speech and assembly. (See Doc. No. 66 at 3; Doc. No. 70 (not challenging the state action prong)). The Court therefore need only focus on the second portion of Plaintiffs' claims, whether Defendants deprived them of rights secured by the Constitution. Waters, 242 F.3d at 358–59.

16

Because the central focus of the parties' briefing is Plaintiffs' First Amendment free speech and assembly claims, the Court will start there. It will follow by briefly addressing Plaintiffs' remaining claims, if any, and requests for relief.

       1.   <u>Plaintiffs' First Amendment Free Speech and Assembly Claims</u>

To properly address Plaintiffs' First Amendment free speech and assembly claims, as the Court did for Cocchini's First Amendment claims against Officer Spry at the motion to dismiss stage (<u>see</u> Doc. No. 56 at 8), the Court must first determine the nature of their claims against the City. <u>See</u> <u>Thaddeus-X v. Blatter</u>, 175 F.3d 378, 388 (6th Cir. 1999) ("First Amendment law is particularly context-driven."). As previously discussed with Cocchini's case (Doc. No. 56 at 8), this exercise proves difficult given the unique nature of Plaintiffs' claims. While Plaintiffs assert that they bring "facial content and viewpoint discrimination" and "right to assembly" claims against the City (Doc. No. 62 at 6), Plaintiffs do not challenge a particular written law, policy, or rule as "facially" discriminatory under the First Amendment.[8] (<u>See, e.g.</u>, Doc. No. 28 ¶ 92 ("The actions of the City of Franklin effectively bestowed the full police power of the state on an independent actor, *i.e.* Franklin Pride, to carry out and enforce an arbitrary and discriminatory policy designed to punish individual free speech activity based solely on the content or viewpoint being expressed."); Case No. 3:24-cv-00223, Doc. No. 1 ¶ 45 ("The City of Franklin assigned its own police officers to enforce and carry out, under threat of arrest, the discriminatory policies of Franklin Pride and its practice of intolerance against others because they engaged in peaceful

---

[8] As the Court discussed in its prior Memorandum Opinion denying Officer Spry's motion to dismiss (Doc. No. 56), Plaintiffs' allegations of both content and viewpoint discrimination are not distinct considering no parties argue that Franklin Pride occurred in a non-public forum. (<u>See</u> Doc. No. 78 at 3 n.4); <u>see also</u> <u>McGlone v. Metro Gov't of Nashville</u>, 749 F. App'x 402, 405 n.1 (6th Cir. 2018). Given this, the Court will again refer only to content discrimination herein.

17

expression of views that Franklin Pride found inconsistent with its message of gay and lesbian culture and lifestyle."); Case No. 3:24-cv-00497, Doc. No. 1 ¶ 98 ("Franklin's policy and practice, and enforcement thereof, including, but not limited to, supplying permittees with proprietary control over the content and viewpoint of speech uttered on public property during public events and the resultant ban on Brown's disfavored expression in the Park . . . discriminates against speech due to religious content and viewpoint[.]")). Instead, Plaintiffs allege and argue that the City violated their First Amendment rights by implementing an unwritten policy or practice for FPD officers to impermissibly regulate Plaintiffs' religious speech and assembly by preventing them from entering the Festival, or removing them from the Festival, at Franklin Pride, TN's request pursuant to its City-issued permit. (See, e.g., Doc. No. 28 ¶ 92; Case No. 3:24-cv-00223, Doc. No. 1 ¶¶ 45, 49; Case No. 3:24-cv-00497, Doc. No. 1 ¶ 89).

Having identified the nature claims at issue, the Court turns to the parties' cross-motions for summary judgment on these claims. (See Doc. Nos. 83, 114, 118, 122, 125). Like Plaintiffs, the Court will analyze Plaintiffs' First Amendment free speech and assembly claims together because they are pled as the same claims, are based on the same facts, and therefore separate analyses would produce the same results. See Christian Legal Soc. Chapter of the Univ. of California, Hastings Coll. of the L. v. Martinez, 561 U.S. 661, 683 (2010); Roberts v. U.S. Jaycees, 468 U.S. 609, 622 (1984) ("[I]mplicit in the right to engage in activities protected by the First Amendment [is] a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends."); see also City of Dallas v. Stanglin, 490 U.S. 19, 24 (1989); Grider v. Abramson, 180 F.3d 739, 749 (6th Cir. 1999) ("government regulation of the speech, assembly, or association activities of members of a public speaker's audience" all evaluated together).

"The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits laws that abridge the freedom of speech." Nat'l Inst. of Fam. & Life Advocs. v. Becerra, 585 U.S. 755, 766 (2018). These claims are analyzed in three steps. "The first step is to determine whether the plaintiff's conduct is protected speech." Saieg v. City of Dearborn, 641 F.3d 727, 734 (6th Cir. 2011). Second, the Court must "identify the nature of the forum, because the extent to which the Government may limit access depends on whether the forum is public or nonpublic." Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 797 (1985). Third, the Court determines "whether the justifications for exclusion from the relevant forum satisfy the requisite standard." Id. The Court will address each of the three prongs of Plaintiffs' First Amendment claims below.

A. Whether Plaintiffs' Conduct Is Protected Speech

The Court starts with the first prong of the First Amendment analysis, whether Plaintiffs' conduct constitutes protected speech. Saieg, 641 F.3d at 734. Because this is a question of law, and the facts on the conduct at issue are undisputed, the Court's ruling on this matter applies to each of the parties' cross-motions. Mayhew v. Town of Smyrna, Tennessee, 856 F.3d 456, 464 (6th Cir. 2017) (first prong of the First Amendment inquiry is a question of law).

Plaintiffs assert that the conduct they either wished to, or did, engage in at the Festival— praying together, speaking about their religious beliefs, and carrying religious literature— constitutes protected speech under the First Amendment. (Doc. No. 62 at 7). It is undisputed that Plaintiffs either engaged in, or sought to engage in, religious expression through displaying signs of their religiosity, orally sharing their religious beliefs, or physically disseminating religious materials on the same. These sorts of activities, regardless of one's views on them, "all fall under the purview of the First Amendment[.]" Bays v. City of Fairborn, 668 F.3d 814, 820 (6th Cir.

19

2012).  This is not a difficult determination to reach, as ample "precedent establishes that private religious speech, far from being a First Amendment orphan, is as fully protected under the Free Speech clause as secular private expression."  Capitol Square Review & Advisory Bd. v. Pinette, 515 U.S. 753, 760 (1995) (collecting cases); see id. ("Indeed, in Anglo–American history, at least, government suppression of speech has so commonly been directed precisely at religious speech that a free-speech clause without religion would be Hamlet without the prince.").

These principles aside, Defendants aver Plaintiffs' speech is unactionable for two reasons: (1) because they constituted "fighting words" under Chaplinsky v. New Hampshire, 315 U.S. 568 (1942) that are not subject to constitutional protection; and (2) because Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. of Boston, 515 U.S. 557 (1995) and Sistrunk v. City of Strongsville, 99 F.3d 194 (6th Cir. 1996) bar Plaintiffs' claims given they impermissibly sought to include their speech in the Festival, despite it being contrary to its collective message.[9]  (Doc. No. 66 at 4–7; Doc. No. 78 at 3; Doc. No. 83 at 12).  For the reasons that follow, neither argument is persuasive.

i.    Fighting Words

Starting with the City's first argument, "[f]ighting words" is a category of unprotected speech that "encompasses words that when spoken aloud instantly 'inflict injury or tend to incite an immediate breach of the peace.'"  Bible Believers v. Wayne Cnty., 805 F.3d 228, 246 (6th Cir. 2015) (quoting Chaplinsky, 315 U.S. at 572).  Whether Plaintiffs engaged in this sort of speech is based "on an objective standard to draw the boundaries of this category—no advocacy can constitute fighting words unless it is 'likely to provoke the *average person* to retaliation."  Id.

_____

[9] The Court notes that Officer Spry moves on only the second reason.  Defendants' argument on that point could be evaluated in the first or second prongs of the First Amendment analysis, or as a separate consideration altogether.  Given both Officer Spry and the City present this issue as one separate from other First Amendment considerations, the Court will address it in this section for the sake of clarity on later portions of its opinion.

(quoting Street v. New York, 394 U.S. 576, 592 (1969)) (citation and quotations omitted) (emphasis added). Because "[o]ffensive statements made generally to a crowd are not excluded from First Amendment protection[,]" for the City to be correct that Plaintiffs' speech constituted fighting words, the speech "must be directed specifically at an individual." Id. (citing RAV v. City of St. Paul, 505 U.S. 377, 432 (1992) (Stevens, J., concurring)); accord Cohen v. California, 403 U.S. 15, 20 (1971) (fighting words constitute a "direct personal insult").

The speech that the City contends constituted unprotected fighting words—Cocchini's discussion with Kleibrink and Pastor Dodge, Russel and Slayden criticizing those at the event for their views on the LGBTQ+ community and religion, Russel and Young calling all attendants sinners and frowning upon their support for the LGBTQ+ community, Young stating that one's ability to be a pastor is based on their sexuality, and Brown arguing with the private security officer about the officer's religious beliefs—certainly insulted many at Franklin Pride, as demonstrated by the various pieces of evidence showing as much. However, as Plaintiffs point out, this does not make them fighting words that cannot serve as the basis of Plaintiffs' First Amendment claims as a matter of law.

None of the speech the City points to constitute fighting words for several reasons. Critically, it is evident from the various body camera and phone recordings that Plaintiffs directed much of their speech to multiple people at different Festival booths or to only each other, making that speech too attenuated from a direct insult to a particular individual to constitute unprotected fighting words. Bible Believers, 805 F.3d at 246; (see, e.g., Doc. No. 86 ¶ 194 (Russel, Slayden, and two other individuals praying "for those churches that you would rebuke those pastors that are pushing this sexual perversion"); id. ¶¶ 176–77 (Russel and Young engaging with booth attendants about their religious beliefs)). Even in the instances where Plaintiffs addressed individuals

21

directly, the footage and deposition testimony demonstrate that Plaintiffs either engaged in conversations (albeit unpleasant ones) without any epithets or expressed general negative sentiments about those attending the Festival. (See, e.g., Doc. No. 78-21 at 93:1–12 (Cocchini discussing religious beliefs with Kleibrink); Doc. No. 86 ¶ 186 (Russel telling a pastor that "he does not throw a party to celebrate [sin] and invite little kids to it"); id. ¶ 175 (Russel telling a booth attendant that the Festival was "sad" because "God wants to set people free" and "heal people from this," and he was "absolutely not" an ally); id. ¶ 178 (Russel challenging a booth attendant about her religious beliefs); id. ¶ 184 (Young challenging attendant on whether the booth's "queer pastor" flyer was scriptural); id. ¶ 215 (Brown telling the private security officer that he is "not a Christian" because "Christian means Christ like")). These interactions, while maybe distasteful, again fail to satisfy the requisite personal, specific insults that are not constitutionally protected. Bible Believers, 805 F.3d at 246. As evidenced by this, while there is some evidence in the record that Festival staffers and booth attendees became angered by Plaintiffs' speech, there is *no* evidence that anyone was provoked to "retaliation," the hallmark of objective fighting words. Street, 394 U.S. at 592.

These facts, taken together, demonstrate that Plaintiffs' speech is far from the "small class of expressive conduct" that courts have found to be fighting words that cannot support a First Amendment claim. Knight Riders of Ku Klux Klan v. City of Cincinnati, 72 F.3d 43, 46 (6th Cir. 1995); see, e.g., Gilles v. Davis, 427 F.3d 197, 205 (3d Cir. 2005) (plaintiff's "epithets directed at the woman who identified herself as a Christian and a lesbian ('Christian lesbo,' 'lesbian for Jesus,' 'do you lay down with dogs,' 'are you a bestiality lover') were especially abusive and constituted fighting words"); Startzell v. City of Philadelphia, Pennsylvania, 533 F.3d 183, 205 (3d Cir. 2008) (Stapleton, concurring) (finding that members of Repent America group that "singled out a

transgendered individual for abuse, repeatedly calling him a "she-man," telling him, "[t]he mirror lied to you this morning" and "[y]our shadow is showing," among other things, constituted fighting words).

It is the nature of "religious speech [that it] might be perceived as offensive to some." Morse v. Frederick, 551 U.S. 393, 409 (2007). Still, that at least some vendors, booth attendants, or attendees of the Festival found Plaintiff's "speech offensive is not a sufficient reason for suppressing it." FCC v. Pacifica Found., 438 U.S. 726, 745 (1978). "Indeed, if it is the speaker's opinion that gives offense, that consequence is a reason for according it constitutional protection." Id. On the undisputed facts presented, the Court concludes that Plaintiffs' speech did not constitute fighting words, but rather is clear protected speech that they may rest their First Amendment claims on.

ii.     Interfering with the Festival's Collective Message

The Court turns to the second argument raised by Defendants, that Hurley and Sistrunk bar Plaintiffs' First Amendment claims entirely. In support, Defendants assert that Franklin Pride conveyed a collective message of acceptance of the LGBTQ+ community that Plaintiffs sought inclusion of while holding a contrary message. Based on this, Defendants assert Plaintiffs' claims are not actionable because they are premised on Plaintiffs' improper attempts to push their anti-LGBTQ+ speech onto the Festival as its own, which Hurley and Sistrunk instruct the First Amendment does not allow.[10]

---

[10] The Court is compelled to comment on Plaintiffs' response to the City's arguments on the applicability of Hurley and Sistrunk, which copy and paste portions of the Court's Memorandum Opinion on Officer Spry's motion to dismiss. (See Doc. No. 85 at 5–6). Plaintiffs' belated citation to the Court's opinion at the end of the paragraph does little to assuage the Court's concerns about this practice. The Court reminds Plaintiffs' counsel that it is their professional obligation as licensed members of the Bar to ensure that materials filed with the Court are supported by proper

23

To properly understand Defendants' arguments, a review of <u>Hurley</u> and <u>Sistrunk</u> is necessary. As previously discussed by the Court (Doc. No. 56 at 14), in <u>Hurley</u>, the Supreme Court held that a state court's order requiring private parade organizers to include the Irish-American Gay, Lesbian, and Bisexual Group of Boston ("GLIB") as a parade unit in the St. Patrick's Day parade violated the private organizers' First Amendment rights because the order "essentially requir[ed] [the organizers] to alter the expressive content of their parade." <u>Hurley</u>, 515 U.S. at 572–73. Similarly, in <u>Sistrunk</u>, the Sixth Circuit found that the plaintiff, who opted to attend a pro-Bush rally while wearing a pro-Clinton pin, did not state a First Amendment claim based on her allegations that she was "not permitted to participate *in the committee's speech* while expressing her own discordant views." <u>Sistrunk</u>, 99 F.3d at 199–200. In coming to that conclusion, the <u>Sistrunk</u> panel found that the pro-Bush permit holder that sought to express a pro-Bush political message through a closed event had the right to do so without adopting the plaintiff's pro-Clinton message as its own. <u>Id.</u>

Together, <u>Hurley</u> and <u>Sistrunk</u> stand for the proposition that one cannot bring a First Amendment claim premised on the notion that one was impermissibly prohibited from engaging in the collective message of another because of that individual's contrary speech. This is because, as <u>Hurley</u> instructs, "when dissemination of a view contrary to one's own is forced upon a speaker intimately connected with the communication advanced, the speaker's right to autonomy over the message is compromised." <u>Hurley</u>, 515 U.S. at 576; <u>see</u> <u>Sistrunk</u>, 99 F.3d at 199 ("To require that the organizers include buttons and signs for Bill Clinton in the demonstration would alter the message the organizers sent to the media and other observers, even if the holders of signs and

_____

citations and are of their own creation. Model Rules of Professional Conduct R. 1.1 & cmt. n.2 (part of a lawyer's duty of competence is thoroughness, which includes proper legal drafting).

wearers of buttons did not otherwise interfere with the pro-Bush rally."). Still, that does not mean that all speech contrary to one's collective message can be excluded from events containing a collective message at will. Rather, "[t]he distinction between demanding to *participate* in another's speech and demanding merely to *speak* is a meaningful one," where the former does not enjoy First Amendment protection, but the latter does. McGlone, 749 F.3d at 407.

To the extent that Defendants rely on Hurley and Sistrunk because they deal with circumstances in which a group sought to express a collective message, they are right to do so. Contrary to the Court's determination at the motion to dismiss stage, where the Court had to view the allegations as true and in Cocchini's favor, the undisputed facts in the record demonstrate that Franklin Pride, TN, as the Festival permittee, sought to convey a collective message at its event. Specifically, the parties agree that Franklin Pride had a collective, expressive message to "celebrate and foster inclusivity of the LGBTQ+ community." [11] (Doc. No. 86 ¶ 93; see id. ¶¶ 96–97, 112–13, 117). To foster that message, Franklin Pride, TN included message-promoting activities, vendors, and performers. (Id. ¶¶ 47, 74–75). On these facts, there is no question that Franklin Pride, TN used the Festival as an opportunity to express its collective message of acceptance and inclusivity in the LGBTQ+ community, much like the message of the St. Patrick's Day parade in Hurley or the pro-Bush rally in Sistrunk.

---

[11] On this point, Plaintiffs' motion on their First Amendment claims is generally deficient given it improperly relies on, as evidence, the Court's assumptions and conclusions made when denying Officer Spry's motion to dismiss. (See, e.g., Doc. No. 62 at 9–10, 13 (relying on the Court's Memorandum Opinion on Officer Spry's motion to dismiss to support their motion for summary judgment)). The Court's evaluation of that Rule 12 motion—which was filed prior to discovery and which the Court evaluated under a different standard of review—is far different from the parties' pending motions that come after they have marshalled the evidence through discovery to support or refute the pending claims. Given this, contrary to Plaintiffs' assertions, any conclusions the Court made at that time are not binding on the parties at summary judgment.

25

But that is where the similarities between <u>Hurley</u>, <u>Sistrunk</u>, and the instant case ends. Despite Defendants' arguments otherwise, there is no evidence in the record that Plaintiffs sought to *participate* in the Festival's speech, rather than merely *speak* in general. <u>McGlone</u>, 749 F.3d at 407. For instance, it is critical to the Court that although Plaintiffs insisted on entering the Festival, they did not seek to participate in its speech by requesting to be staff members, vendors, performers, or booth attendants. <u>Parks v. City of Columbus</u>, 395 F.3d 643, 651 (6th Cir. 2005). Instead, the undisputed facts on Plaintiffs' speech demonstrate that they entered the Park to discuss their Christian beliefs amongst themselves and with others in attendance, hand out religious literature, and pray together. <u>See</u> <u>id.</u> at 651. On these facts, the Court "see[s] no risk that those attending the [F]estival, or even ambling past [the] Park, would have mistaken [Plaintiffs'] preaching [or other religious speech] for the speech of the Pride Festival." <u>McGlone</u>, 749 F.3d at 407. Nor did Plaintiffs "alter the message of [the Festival] sent to the media and other observers" like the Sixth Circuit panel contemplated in <u>Sistrunk</u>, 99 F.3d at 199, or change the nature of the event's message to onlookers, as the inclusion of the GLIB parade unit would have in <u>Hurley</u>. 515 U.S. at 572–73. Given these distinctions between the instant case and the facts in <u>Hurley</u> and <u>Sistrunk</u>, the Court finds neither precedent bars Plaintiffs' claims here.[12] <u>See</u> <u>Gathright v. City of Portland, Or.</u>, 439 F.3d 573, 579 (9th Cir. 2006) (relying on <u>Parks</u> in rejecting defendant's invocation of <u>Hurley</u> and <u>Sistrunk</u> under similar factual circumstances).

---

[12] <u>Sistrunk</u> differs from the instant case in another meaningful way: it "concerned a permit that specifically granted the Bush-Quayle '92 Committee exclusive use of the grounds for their members and their invitees." <u>McGlone</u>, 749 F. App'x at 407. That is not the case here because, while the Festival was permitted, it was not restricted to a special class of people, as anyone and everyone could enter the Park that day.

Accordingly, the Court finds Defendants' arguments on the first prong are unpersuasive. The undisputed facts demonstrate as a matter of law that Plaintiffs' conduct in and near the Festival constituted protected speech under the First Amendment.

### B. The Nature of the Forum

The Court next turns to the second prong of the First Amendment analysis, the nature of the forum at issue. See Cornelius, 473 U.S. at 797. As with the first prong of the First Amendment analysis, the second prong is also a question of law that can be decided by the Court given the undisputed facts presented on the applicable forum at issue. Helms v. Zubaty, 459 F.3d 252, 256 (6th Cir. 2007) (nature of the forum is a question of law).

As the Court explained at the motion to dismiss stage, "[t]here are four types of speech fora: nonpublic, public, designated public, and limited public." Hartman v. Thompson, 931 F.3d 471, 478 (6th Cir. 2019) (citing Pleasant Grove City v. Summum, 555 U.S. 460, 469–70 (2009) and Miller v. City of Cincinnati, 622 F.3d 524, 534–35 (6th Cir. 2010)). The relevant forum that Plaintiffs sought to exercise their First Amendment rights in—the Park—is traditionally considered public. United States v. Grace, 461 U.S. 171, 177 (1983) ("It is also true that 'public places' historically associated with the free exercise of expressive activities, such as streets, sidewalks, and parks, are considered, without more, to be 'public forums.'"); Hague v. Comm. for Indus. Org., 307 U.S. 496, 515 (1939) (streets and parks "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions"); Jobe v. City of Catlettsburg, 409 F.3d 261, 266 (6th Cir. 2005) (the "traditional public forum" consists of "public streets and parks").

Still, the Park's label is not dispositive to the Court's analysis, as "the forum analysis is not complete merely by identifying the government property at issue." Cornelius, 473 U.S. at 801. Whether the Park constituted a public forum on the day of Franklin Pride "hinges on a case-by-case inquiry in which no single factor is dispositive," and includes the extent to which the speakers sought access to the property and its designation on the day in question. United Church of Christ v. Gateway Econ. Dev. Corp. of Greater Cleveland, 383 F.3d 449, 453 (6th Cir. 2004); Cornelius, 473 U.S. at 801 ("[w]hen speakers seek general access to public property, the forum encompasses that property"); see Boardley v. U.S. Dept. of Interior, 615 F.3d 508, 515 (D.C. Cir. 2010) ("The dispositive question is not what the forum is called, but what purpose it serves, either by tradition or specific designation."). To determine whether the Park retained its public nature during Franklin Pride, the Court must look to its objective characteristics, customary use, and Plaintiffs' access. Ark Educ. Television Comm'n v. Forbes, 523 U.S. 666, 677 (1998) (quoting Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45 (1983)) ("Traditional public fora are defined by the objective characteristics of the property, such as whether, 'by long tradition or my government fiat,' the property has been 'devoted to assembly and debate.'"); Parks, 395 F.3d at 648–49 ("[T]o determine whether a public place constitutes a traditional public forum, we must look to the purpose of the forum and whether it has been customarily used for communication and assembly."); see Cornelius, 473 U.S. at 801.

On the day of the Festival, the entire Park had been designated as subject to Franklin Pride, TN's permit. (Doc. No. 86 ¶ 8). Franklin Pride, TN obtained liability insurance for the event. (Id. ¶ 22). The Festival's perimeter was marked with signage, and was fenced and barricaded. (Id. ¶ 46). Festivalgoers could only access the Park through two entry points on the south and east sides of the Festival, respectively, (id.), which were monitored by security guards and Franklin Pride

28

staff. (Doc. No. 78-35). The Festival's rules were displayed prior to entry. (Doc. No. 86 ¶ 50). While Franklin Pride, TN did not charge anyone for entry to its open Festival, it did require all attendees to wear wristbands. (Doc. No. 79 ¶ 26; Doc. No. 82 ¶ 16; Doc. No. 64-1 at 10:25–11:3). Plaintiffs sought general access to the Festival to exercise their First Amendment expression and assembly rights. (Doc. No. 79 ¶¶ 69, 86, 102; Doc. No. 78-35; Doc. No. 86 ¶ 121).

The characteristics of the Park on the day of Franklin Pride, and Plaintiffs' seeking general access to the Park, reflect similar circumstances where the Sixth Circuit found traditionally public forums to retain that nature during permitted events. For instance, in <u>Parks</u>, the City of Columbus granted the Columbus Arts Council a non-exclusive use permit to conduct a free arts festival open to the public, which the Columbus Arts Council obtained liability insurance to execute. <u>Parks</u>, 395 F.3d at 645–47. On the day of the arts festival, the City of Columbus placed barricades at several intersections of Civic Center Drive, on which the festival took place. <u>Id.</u> at 645. The Columbus Arts Council had also hired security for the event. <u>Id.</u>at 646. The plaintiff entered the arts festival "wearing a sign bearing a religious message" and began to distribute literature at the event. <u>Id.</u> at 646. Under these circumstances, the Sixth Circuit held that Civic Center Drive—a street traditionally considered a public forum, which the plaintiff sought general access to—retained that character, given the City of Columbus could not "claim that one's constitutionally protected rights disappear[ed] because a private party [] host[ed] an event that remained free and open to the public." <u>Parks</u>, 395 F.3d at 650–52.

The Sixth Circuit came to a similar conclusion in <u>Bays v. Fairborn</u>. There, the City of Fairborn entered an "Agreement for Facility Use" with the Fairborn Arts Association and the Fairborn Lions Club to hold a festival in a designated portion of the Community Park, which would remain free and open to the public that day. 668 F.3d at 817. The Fairborn Arts Association and

29

the Fairborn Lions Club required applications for booth space for those who wished "to sell merchandise, food, or arts and crafts" on the day of the festival.  Id.  Fairborn police officers attended the event for security purposes.  Id. at 818.  On the day of the festival, the plaintiff attended seeking to convey his religious beliefs by speaking, preaching, distributing literature, and displaying signs.  Id. at 818.  Based on these facts, the Bays panel relied on Parks in concluding that the portion of the Community Park holding the festival remained a public forum given it remained free and open during the contracted-for event.  Id. at 821.

Considering Bays and Parks and the undisputed material facts, the Park retained its character as a traditional public forum throughout Franklin Pride.  Like in Bays and Parks, Franklin Pride, TN held the Festival as a permitted event that was free and open to the public.  C.f. Parks, 395 F.3d at 652 n.8 (noting Parks did not hold "that [the plaintiff's] First Amendment rights would vanish if the permit authorized exclusive use").  Also as in Parks, Franklin Pride, TN hired security for the event, had police officers present, and used barricades to block off normal traffic in and out of the Park.  In further parallel with Sixth Circuit precedent, Franklin Pride, TN carried liability insurance for the Festival, and required vendors to apply for and abide by specific terms of use for booth spaces.  Under these circumstances, the Park remained a public forum on the day of Franklin Pride, despite Franklin Pride, TN's measures to make the Park its own pursuant to its permit.

Even with published relevant Sixth Circuit authority instructing otherwise, the City boldly urges the Court to conclude that the Park was a limited public forum during the Festival based on two out-of-circuit district court cases, Warden v. Miranda, 2017 WL 3130664 (D. Ariz. July 24, 2017) and Parkland Republican Club v. City of Parkland, 268 F. Supp. 2d 1349 (S.D. Fla. 2003).  In both Warden and Parkland Republican Club, those courts affirmatively answered a question that has not been directly determined by the Sixth Circuit: whether a private entity, through a

municipality's permitting scheme, has the power to transform a traditional public forum into a limited one.  See Bays, 668 F.3d at 821 ("Whether a municipality has the power to transform a traditional public forum into a limited or nonpublic forum is an open question."); Parks, 395 F.3d at 650 (noting that "other jurisdictions have been conflicted as to whether a city may transform a traditional public forum").  Because the Court finds that the material facts presented demonstrate that the Park remained a public forum on the day of the Festival, it need not opine on this issue or the City's reliance on non-binding district court authority to the contrary.  Nevertheless, even considering the City's argument on the merits, the Court finds the weight of legal authority dictates the Court's conclusion here is appropriate.

As an initial matter, Parks, Bays, and other circuit courts have held that the state's issuance of a permit to a private party alone does not change the nature of a quintessential public forum. See Teesdale v. City of Chicago, 690 F.3d 829, 834 (7th Cir. 2012) ("The city streets are a traditional public forum, and their character as a public forum is retained even though they are used for a public festival sponsored by a private entity."); Startzell, 533 F.3d at 196 ("The issuance of a permit to use this public forum does not transform its status as a public forum.") (citing Parks, 395 F.3d at 652); see also Gathright, 439 F.3d at 576–78 (evaluating restriction of plaintiff's speech in permitted property that remained public during the permitted event).  These cases dealing with traditionally public forums like parks and streets differ from those where limited public forums arise, when the property "is not open by tradition to the public for communication[.]"  Travis v. Owego-Apalachin Sch. Dist., 927 F.2d 688, 692 (1991); see Martinez, 561 U.S. at 679 n.11 ("[G]overnmental entities establish limited public forums by opening property limited to use by certain groups or dedicated solely to the discussion of certain topics.") (citation and quotations omitted).

31

The distinction between public and limited public forums makes sense, given "[i]n places which by long tradition or by government fiat have been devoted to assembly and debate," such as the Park, "the rights of the State to limit expressive activity are sharply circumscribed." Perry, 460 U.S. at 45; see Carey v. Brown, 447 U.S. 455, 460 (1980) ("Streets, sidewalks, parks, and other similar public places are so historically associated with the exercise of First Amendment rights that access to them for the purpose of exercising such rights cannot constitutionally be denied broadly and absolutely.") (citations and quotations omitted). Thus, it follows that the state "may not by its own *ipse dixit*," whether through permit or otherwise, "destroy the 'public forum' status of streets and parks which have historically been public forums." Grace, 461 U.S. at 180 (quoting U. S. Postal Serv. v. Council of Greenburgh Civic Associations, 453 U.S. 114, 132 (1981)); see Irish Subcomm. of Rhode Island Heritage Comm'n v. Rhode Island Heritage Comm'n, 646 F. Supp. 347, 353 (D.R.I. 1986) ("To allow the government to limit traditional public forum property and thereby create within it a nonpublic forum would destroy the entire concept of a public forum."). Concluding otherwise would run contrary to decades of First Amendment jurisprudence that recognizes the inalienable nature of First Amendment rights in public forums. See, e.g., Arkansas Educ. Television Com'n v. Forbes, 523 U.S. 666, 678 (1998) ("[T]raditional public fora are open for expressive activity regardless of the government's intent,"); Int'l Soc'y for Krishna Consciousness v. Lee, 505 U.S. 672, 694 (1992) (Kennedy, J., concurring) (The First Amendment should not "grant[ ] the government authority to restrict speech by fiat."); First Unitarian Church of Salt Lake City v. Salt Lake City Corp., 308 F.3d 1114, 1124 (10th Cir. 2002) ("The government cannot simply declare the First Amendment status of property regardless of its nature and its public use.").

With this legal backdrop in mind, the City's reliance on <u>Warden</u> and <u>Parkland Republican Club</u> is unavailing. Both non-binding cases fail to alter the Court's decision, as neither case squarely maps on to the issues presented here or appropriately grapples with the precedent that dictates a divergent conclusion is more appropriate. The Court starts with considering <u>Warden</u>. There, a private party obtained an exclusive use permit for a portion of the park to conduct a rally, secured entrance and exit points, provided security, and removed unwanted attendees. <u>Warden</u>, 2017 WL 3130664, at *14. Based on this exclusive use permit, the <u>Warden</u> court concluded that the portion of the park that would normally be a public forum transformed into a limited public forum during the course of the rally.

The City's reliance on this case fails for two reasons. First, although <u>Warden</u> found that the park constituted a limited public forum, it did so only on the back of the case's actual holding: that <u>Hurley</u> applied such that the city could not constitutionally require a permittee organization to include discordant speakers in its rally. <u>Id.</u> at *15. By contrast, <u>Warden</u> characterized its forum analysis as follows: "[e]ven if <u>Hurley</u> does not apply, that area in Armory Park exclusively permitted for the rally on May 1, 2012, was a limited public forum[.]" <u>Id.</u> The <u>Warden</u> court's use of the "hallmark language of dicta (e.g., 'even if'[)]" demonstrates that its conclusion that the park constituted a limited public forum did not "contribute to the judgment" with binding force. <u>Firexo, Inc. v. Firexo Grp. Ltd.</u>, 99 F.4th 304, 325 (2024) (citation and quotations omitted). Further, the <u>Warden</u> court's actual holding finding that <u>Hurley</u> entitled the defendants to judgment as a matter of law exemplifies the differences between that case and this one. While the rallygoers in <u>Warden</u> sought to engage in speech different from the expressive message of the rally at the permitted area in the park, here, the Court has concluded that Plaintiffs did not seek to participate in the collective message of Franklin Pride. <u>See</u> <u>supra</u>, Section III.1.A.ii. Finally, the <u>Warden</u>

court takes for granted the premise that the state had authority to transform the public park to a limited forum through its granting a private party a permit over the space. Warden, 2017 WL 3130664, at *14. As the Court just discussed, this is an assumption that is far from certain.

The Court also finds the City's citation to Parkland Republican Club to be misplaced. There, the relevant forum constituted a parade during a festival that was open to the public on the streets of Parkland, which would typically constitute a public forum. 268 F. Supp. 2d at 1355. In Parkland Republican Club, the court carefully considered whether the city had authority to transform that public space to a limited public forum, finding it did. In support, the Parkland Republican Club relied upon People for Ethical Treatment of Animals v. Giuliani, 105 F. Supp. 2d 294, 313 (S.D.N.Y. 2000) and Lehman v. City of Shaker Heights, 418 U.S. 298 (1974) in holding that the state can transform traditionally public forums to limited ones. This reliance is misplaced. In Lehman, the Supreme Court held that the commercial "card cars" located on city transit vehicles did not constitute First Amendment forums given they were part of the commercial venture the city engaged in and which the city had consciously limited spaces for. 418 U.S. at 304. The Giuliani court extended the Supreme Court's proprietary capacity principle in Lehman to conclude that a similar commercial venture, a public art exhibit, could be altered by the state for nonpublic purposes. 105 F. Supp. 2d at 315–36 (resting this determination on the fact that the plaintiff's argument "implicates not so much the status of particular parks or streets, but the scope of the government's power to administer its own operations as these relate to the uses of public property and things"). Based on that logic, Parkland Republican Club concluded states also have a right to alter public forums, like streets, through special events. 268 F. Supp. 2d at 1356–57. This is where Parkland Republican Club missteps, as a weighty backdrop of cases, including Giuliani, dictate that traditionally public forums like streets and parks are far different from the

34

properties contemplated in <u>Lehman</u> and <u>Giuliani</u>. <u>See</u> 268 F. Supp. 2d at 316 ("Wherever that line may be drawn, the limitation at issue here on expressive activities in public spaces is far from the scope of the blanket restrictions on general public access to sidewalks that the Supreme Court declared may impermissibly destroy the special status enjoyed by traditional public forums."). Given this, the Court declines to follow <u>Parkland Republican Club</u> here.

The Court finds that, on the undisputed facts presented, the Park constituted a public forum throughout the duration of Franklin Pride, irrespective of the permit the City granted to Franklin Pride, TN for the Festival.

## C. The Justifications for the Exclusion

Having determined that Plaintiffs engaged in protected speech in a public forum during Franklin Pride, the Court turns to the third prong of Plaintiffs' First Amendment claims: whether the City's and Officer Spry's justifications for Plaintiffs' exclusion from the Festival satisfy the requisite standard. <u>See</u> <u>Cornelius</u>, 473 U.S. at 797. As the Court articulated in its prior Memorandum Opinion, in public forums—such as the Park on the day of the Festival—"[f]or the state to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." <u>Parks</u>, 395 F.3d at 653. "The state may also enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." <u>Id.</u> (collecting cases). A portion of this analysis, whether Defendants' justifications for Plaintiffs' exclusion from the Park are content-based or content-neutral, is a question of fact. <u>See</u> <u>Lowery v. Jefferson Cnty. Bd. of Educ.</u>, 586 F.3d 427, 438 (6th Cir. 2009) (whether impermissible discrimination caused the alleged constitutional violation is a question of fact); <u>Putnam Pit, Inc. v. City of Cookeville, Tenn.</u>, 221 F.3d 834, 846

(6th Cir. 2000) (same); but see United States v. Doe, 968 F.2d 86, 88 (D.C. Cir. 1992) (holding narrowly tailored question is "of course a question of law").

The Court cannot determine as a matter of law whether the City and Officer Spry's justifications for excluding Plaintiffs from the Festival satisfy the requisite standard because there is a genuine dispute of material fact about those justifications. On one hand, Plaintiffs assert that Defendants excluded them from the Festival because of the content of their speech. For instance, Plaintiffs present admissible evidence that Franklin Pride staff: ordered Cocchini removed after he began engaging in his religious speech with those at the Glendale Methodist Church booth (Doc. No. 78-33) under the pretense that he was breaking rules, which Officer Spry did not see occur (Doc. No. 79 ¶ 69); requested Russel, Young, and Slayden be removed after they had been praying and discussing their religious beliefs at the Festival (Doc. No. Doc. No. 78-34), despite appearing nonconfrontational when officers spoke with them (Doc. No. 79 ¶ 94); and prohibited Brown from entry because he was carrying religious materials into the Festival and did not seem supportive of Franklin Pride's message (Doc. No. 78-32). Plaintiffs further present evidence that the City FPD officers followed Franklin Pride's instruction to deny Plaintiffs' access to the Festival "based solely on the organizers' preference[,]" (Doc. Nos. 78-32–34), which had no constitutional bounds that prohibited content discrimination. (Doc. No. 69-8 at 12:11–16; Doc. No. 69-9 at 13:11–5).

On the other hand, Defendants argue that the FPD's reason for restricting Plaintiffs' speech—because the Festival staffers directed them to—stems from only content-neutral justifications. (Doc. No. 66 at 10–11; Doc. No. 70 at 15). In support, Defendants cite to evidence showing: (1) the authority for Festival staffers to request attendees' removals stems from the City's permitting scheme, which applied uniformly to all applicants (Doc. No. 86 ¶ 4); (2) the City removed Plaintiffs after Festival staffers received complaints on their repeatedly disruptive

36

behavior, which interfered with Franklin Pride being able to use its permit for its intended purpose (id. ¶¶ 11–12, 33; Doc. No. 78-31; Doc. No. 89 ¶¶ 36–41); and (3) the City restricted Plaintiffs' speech on account of Plaintiffs' violations of the Festival's prohibition against distribution of materials from non-vendors (Doc. No. 86 ¶¶ 78, 84).[13]

Viewing these pieces of evidence in the light most favorable to the non-movant on each pending motion, there is a genuine dispute of fact on the rationale for the City and Officer Spry restricting Plaintiffs' speech that precludes a finding of summary judgment in any party's favor. On Plaintiffs' motion, although there is evidence in the record suggesting that the City and Officer Spry restricted Plaintiffs' speech on account of the Franklin Pride staffers' disagreement with their religious messages, Defendants present conflicting evidence that they restricted Plaintiffs' speech based on Franklin Pride's request that they do so to maintain their use of their permit, prevent Plaintiffs' disruptive behavior, and enforce Franklin Pride's ban on distributing outside materials. Any one of these content-neutral reasons for curbing Plaintiffs' speech, if found credible by the jury, would satisfy the applicable standard. As here, Defendants proffer evidence they executed these restrictions in a narrowly tailored fashion to protect the City's significant interests in upholding Franklin Pride, TN's rights and maintaining security at the Festival. Viewing the evidence in Plaintiffs' favor when considering the City's motion, the result is the same.[14] Although the City present evidence that they restricted Plaintiffs' speech for content-neutral reasons, Plaintiffs present their own evidence showing that not to be the case. Plaintiffs also offer evidence demonstrating that, should a jury find that Defendants restricted their speech because the Franklin

---

[13] Officer Spry argues only the first and second points discussed here. (Doc. No. 70 at 15; Doc. No. 83 at 12–13).

[14] Because Officer Spry does not move for summary judgment on this basis, the Court need not address his affirmative motion here.

Pride staffers did not like their messages, that they followed Franklin Pride, TN's instructions without any narrowly tailored barometers constraining their requests for removal.

Given this critical material dispute of fact in the record, the Court finds that the question of what motivated Plaintiffs' exclusion from the Park must be decided by a jury. Accordingly, both Plaintiffs' and the City's motions for summary judgment on Plaintiffs' First Amendment claims must be denied on this ground.

### 2. The City's Municipal Liability

The City raises yet another argument contending it is entitled to summary judgment on Plaintiffs' First Amendment free speech and assembly claims: that Plaintiffs cannot establish municipal liability under Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978). "To prevail in a § 1983 suit against a municipality," like the suits Plaintiffs bring against the City here, "a plaintiff must show that the alleged federal right violation occurred because of a municipal policy or custom." Thomas v. City of Chattanooga, 398 F.3d 426, 429 (6th Cir. 2005) (citing Monell, 436 U.S. at 694). This is because a municipality "may not be sued under § 1983 for an injury inflicted solely by its employees or agents." Monell, 436 U.S. at 694.

"There are at least four avenues a plaintiff may take to prove the existence of a municipality's illegal policy or custom." Thomas, 398. F.3d at 429. "The plaintiff can look to (1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations." Id. (citations omitted). Here, Plaintiffs allege the first: that the City had an official policy of granting permit holders complete discretion over who could attend permitted events, backed by FPD police power, in a manner that infringed on Plaintiffs' rights. (Doc. No. 36 ¶ 101; Case No. 3:24-cv-00223, Doc. No. 1 ¶ 45;

38

Case No 3:24-cv-00497, Doc. No. 1 ¶ 98).  "'Official policy' often refers to formal rules or understandings—often but not always committed to writing—that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time." Pembaur v. City of Cincinnati, 475 U.S. 469, 480–81 (1986).

"As [] § 1983 municipal liability jurisprudence illustrates, however, it is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality." Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown, 520 U.S. 397, 404 (1997).  "The plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged," in that "the municipal action was taken with the requisite degree of culpability" and there must be "a direct causal link between the municipal action and the deprivation of federal rights." Id.

As demonstrated above, there is a genuine dispute of material fact on whether Plaintiffs suffered a constitutional violation.  See supra, Section III.1.C.  Assuming that violations of Plaintiffs' First Amendment rights did occur, the remaining question is whether Plaintiffs raise a genuine dispute of fact on whether the City had an official policy or practice of granting permit holders complete discretion for attendance at their events that caused those constitutional injuries. On this issue, the Court shares the City's view that Plaintiffs' response to its municipality arguments is convoluted.  However, because Plaintiffs did respond to the City's arguments (albeit tangentially), and have repeatedly discussed the relationship between the City's policy of granting unfettered discretion to permittees for their events on their constitutional injuries, the Court finds Plaintiffs present sufficient evidence in the record raising a genuine dispute of material fact on the City's municipal liability.

For instance, Plaintiffs emphasize that: the City issued a permit to Franklin Pride that was open to the public (Doc. No. 79 ¶¶ 2–3); the City conducted a meeting with FPD officers present where it instructed that they could remove individuals at Franklin Pride's request (Doc. No. 69-8 at 12:11–16; Doc. No. 69-9 at 13:11–5); and the FPD officers then did so on the day of the Festival, and explained as much to Plaintiffs. (Doc. Nos. 78-32–34). There is evidence in the record that the City's policy went so far as to endorse the unfettered discretion of Franklin Pride, TN. For example, Officer Spry informed Cocchini prior to his arrest that his removal was "not [the FPD's] decision" and that they "d[idn't] have anything to do with" it. (Doc. No. 78-33 at 1:11–1:15). Similarly, Officer Sanchez informed Young and Russel that if "the organizers say you guys [had to] go," then they would "have to go," (Doc. No. 78-31 at 1:26–1:33), and Lieutenant Cates told Brown on his denial to the Festival that he "ha[d] no control over it" given "[t]he event organizers d[idn't] want you over [there] or in the event," and "that's their call." (Doc. No. 78-32 at 7:12–7:22). Viewing the facts in Plaintiffs' favor, as required, the FPD officers' statements all stemmed directly from the City's briefing instructing the officers to unequivocally abide by Franklin Pride, TN's instructions.

On these facts, a reasonable jury could conclude that, if Plaintiffs' First Amendment rights had been violated at Franklin Pride, the City's policy of allowing permit holders complete discretion over those that may attend their open events was the moving force behind those violations. Brown, 520 U.S. at 404. Accordingly, the City's motion will be denied on this issue, and Plaintiffs' First Amendment free speech and assembly claims against it will proceed to trial.

### 3. Whether Officer Spry is Entitled to Qualified Immunity

One final hurdle on Cocchini's First Amendment free speech and assembly claims remains: Officer Spry's contention that he is entitled to qualified immunity as a matter of law. (Doc. No.

40

70). As the Court instructed at the motion to dismiss stage, "[q]ualified immunity, if it applies, is a defense not just against liability, but against suit itself." Johnson v. Moseley, 790 F.3d 649, 653 (6th Cir. 2015) (citation omitted). Now that Officer Spry has raised the defense, it is Cocchini's burden of showing he is not entitled to it. Reilly v. Vadlamudi, 680 F.3d 617, 623 (6th Cir. 2012). In doing so, Cocchini must satisfy both steps of the qualified immunity inquiry, that: (1) Officer Spry violated a "constitutional right" of Cocchini's and (2) the constitutional right was "clearly established." Saucier v. Katz, 533 U.S. 194, 201 (2001); Crawford v. Tilley, 15 F.4th 752, 762 (6th Cir. 2021).

Officer Spry asserts he is entitled to qualified immunity because Cocchini cannot satisfy the second prong of the qualified immunity test. This makes sense, as taking the evidence in the light most favorable to Cocchini, he has presented evidence supporting a finding that Officer Spry violated his First Amendment rights to free speech and assembly by arresting him at Franklin Pride. See supra, Section III.1; see also Saucier, 533 U.S. at 201 (the first prong of the qualified immunity analysis requires courts to "[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a [federal] right"). Accordingly, the Court need only address the second prong of the qualified immunity analysis further.

Officer Spry may "be shielded from liability for civil damages if [his] actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Hope v. Pelzer, 536 U.S. 730, 739 (2002) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). "For a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Id. at 739 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). In determining whether a right is "sufficiently clear," the Court should not define them "at a high level of

generality." Ashcroft v. al-Kidd, 563 U.S. 731, 742 (2011). This "usually means [Cocchini] must identify a case with facts 'similar enough that' it 'squarely governs this one[.]'" Moore v. Oakland Cnty., Michigan, 126 F.4th 1163, 1167 (6th Cir. 2025) (quoting Lee v. Russ, 33 F.4th 860, 863 (6th Cir. 2022)) (quotations omitted). Still, "[t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, see Mitchell [v. Forsyth], 472 U.S. 511, 535 n.12 (1985); but it is to say that in the light of pre-existing law the unlawfulness must be apparent." Anderson, 483 U.S. at 640; see Harcz v. Boucher, 763 F. App'x 536, 542 (6th Cir. 2019) ("To violate a clearly established right, courts 'do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.'") (quoting al-Kidd, 563 U.S. at 741).

In addressing this prong of the qualified immunity analysis, courts assess the "'objective legal reasonableness' of the allegedly unlawful action 'in light of the legal rules that were clearly established at the time it was taken.'" Hall v. Navarre, 118 F.4th 749, 759 (6th Cir. 2024) (internal citation omitted). In doing so, courts must ask whether "Supreme Court precedent as well as that of the circuit courts" "'placed the . . . constitutional question beyond debate.'" Id. (quoting al-Kidd, 563 U.S. at 741). "If *no* reasonably competent officer would have taken the same action, then qualified immunity should be denied; however, 'if officers of reasonable competence could disagree on [the legality of the action], immunity should be recognized.'" Humphrey v. Mabry, 482 F.3d 840, 847 (6th Cir. 2007) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)). Ultimately, "'the salient question . . . is whether the [] law' at the time of an incident provided 'fair warning' to the [officer] 'that [his] alleged [conduct] was unconstitutional.'" Tolan v. Cotton, 572 U.S. 650, 656 (2014) (quoting Hope, 536 U.S. at 739). Under this standard, "[q]ualified immunity leaves government authorities 'ample room for mistaken judgments.'" Humphrey, 482 F.3d at

847 (quoting <u>Scott v. Clay County</u>, 205 F.3d 867, 873 n.9 (6th Cir. 2000)). Indeed, the "doctrine protects 'all but the plainly incompetent or those who knowingly violate the law.'" <u>Humphrey</u>, 482 F.3d at 847 (quoting <u>Malley</u>, 475 U.S. at 341)).

Even under this demanding standard, the Court must keep the posture of the case in mind. Indeed, in deciding whether Officer Spry is entitled to qualified immunity at this stage, the Court "may not resolve genuine disputes of fact in favor of the party seeking summary judgment." <u>Tolan</u>, 572 U.S. at 656. Instead, consistent with Rule 56, the Court "must take care not to define a case's 'context' in a manner that imports genuinely disputed factual propositions." <u>Id.</u> at 657 (citing <u>Brosseau v. Haugen</u>, 543 U.S. 194, 195, 198 (2009) (determining whether conduct violated clearly established law "'in light of the specific context of the case'" and construing "facts . . . in a light most favorable to" the nonmovant)).

Officer Spry contends he is entitled to qualified immunity on Cocchini's First Amendment claims because: (1) there is no precedent showing it was clearly established at the time of Cocchini's arrest that Officer Spry arresting Cocchini for trespassing at a special event, supported by probable cause, while unaware of his First Amendment activity would amount to First Amendment discrimination; and (2) Cocchini cannot show that it was unreasonable for Officer Spry to rely on the City's permitting scheme and official designation of the event as private when making his arrest. (Doc. No. 70 at 10–11). In response, Cocchini: (1) boils Officer Spry's arguments down to an assertion that he merely rely on his superiors' orders, which Cocchini deems insufficient; and (2) asserts that Officer Spry's reliance on the City's permitting scheme and his superiors' instruction that the Festival was a private event was unreasonable in light of well-established precedent showing otherwise. Viewing the facts in Cocchini's favor, the Court agrees

43

with Cocchini that there are genuine disputes of material fact precluding Officer Spry's entitlement to qualified immunity.

In the present case, the specific conduct at issue is as follows: a uniformed police officer, working security at a public festival, removed and arrested an attendee for trespass after the private event organizer asked that attendee to be removed, where the attendee was (according to the evidence in Cocchini's favor) calmly sharing religious viewpoints and not committing any independent disturbance or crime. The law was clearly established as of June 2023 that it is unreasonable for a reasonable officer to arrest an individual for the content of his speech that he engaged in at a public forum. As Cocchini points out, authority like <u>Parks</u>, <u>Bays</u>, <u>Startzell</u>, and <u>Gathright</u> all instruct that one's First Amendment rights do not dissipate merely because a private party hosts an event that remains free and open to the public, as the Festival was. <u>See</u> <u>Parks</u>, 395 F.3d at 652; <u>Bays</u>, 668 F.3d at 820; <u>Startzell</u>, 533 F.3d at 199; <u>Gathright</u>, 439 F.3d at 576–78. Further, Cocchini emphasizes that there is plenty authority to suggest that there was no proper justification for arresting him at Festival, considering the evidence in the record demonstrating he acted peacefully and did not seek to disrupt the event. <u>See</u> <u>Parks</u>, 395 F.3d at 653–54.

In further support, Cocchini cites to <u>Jankowski v. City of Duluth</u>, 2012 WL 4481302, at *1, *3 (D. Minn. Sept. 28, 2012), where the court denied qualified immunity to an officer that ordered the plaintiff cease his religious expression at a permitted event in a public park. While the court in <u>Jankowski</u> made that decision at the motion to dismiss stage, the same rationale rings true in the instant case when viewing the facts in Cocchini's favor. That Officer Spry avows that he did not "have any knowledge whatsoever" of the rationale for Cocchini's removal does not change that there was clearly established law dictating he should not have done so. <u>See</u> <u>Parks</u>, 395 F.3d at 652; <u>Bays</u>, 668 F.3d at 820; <u>Startzell</u>, 533 F.3d at 199; <u>Gathright</u>, 439 F.3d at 576–78. In fact,

44

Officer Spry's lack of knowledge on why he was arresting Cocchini presents its own issue, as his total reliance on Franklin Pride staffers' and his superiors' instructions to do so is problematic in its own right. See, e.g., Kennedy v. City of Cincinnati, 595 F.3d 327, 337 (6th Cir. 2010), cert. denied, 562 U.S. 832 (2010) ("Under the Supremacy Clause, public officials have an obligation to follow the Constitution even in the midst of a contrary directive from a superior or in a policy.") (citations and quotations omitted). State action can still result in a First Amendment violation even absent the officer's subjective intent if the effect of that action is to suppress a particular viewpoint or content in a public forum.

Officer Spry's countervailing authority does not demand an alternative outcome. In support of his assertion that it was not clearly established that he acted unreasonably in relying on the City's permitting scheme in arresting Cocchini, he relies on Blankenship v. Louisville-Jefferson Cnty. Metro Gov't, 2024 WL 1221180 (W.D. Ky. Mar. 21, 2024). In Blankenship, the plaintiff alleged an officer arrested him for criminal trespassing while he was on the sidewalk of Churchill Downs outside of the 2022 Kentucky Derby sharing his message, displayed signs and flags, and distributed literature with bystanders. Id. at *1. In response, the plaintiff brought First, Fourth, and Fourteenth Amendment claims against the arresting officer. Id. The officer moved to dismiss the false arrest claim under the Fourth Amendment on qualified immunity grounds, arguing that the allegations demonstrated that he reasonably believed he had probable cause to arrest the plaintiff. Id. at *4. The Blankenship court was persuaded by this argument, considering the plaintiff alleged that the permitting scheme at-issue "purported to allow Churchill Downs to exclude individuals from the sidewalk for any reason" and "Churchill Downs wanted [the plaintiff] removed pursuant to the permitting scheme." Id. at *7. In turn, the Blankenship court granted the officer qualified immunity on the Fourth Amendment claim, finding that the facts alleged in the

45

complaint showed that the officer "reasonably believed [the plaintiff] was on private property for the purpose of [the criminal trespassing code]" such that he did not lack probable cause to arrest the plaintiff. Id. at *8.

The clear differences between Blankenship and the instant case render it irrelevant authority. To start, the facts alleged in Blankenship differ from those viewed in Cocchini's favor here. Rather than relying exclusively on the City's permitting scheme that granted Franklin Pride, TN its permit for the Festival, as the plaintiff did in Blankenship, Cocchini proffers evidence of a different nature: that the City had an unwritten policy of granting Franklin Pride complete discretion over who could be removed from its permitted space, irrespective of the circumstances for removal or that the permit kept the space open. This distinction cuts directly against the rationale in Blankenship granting qualified immunity on the plaintiff's Fourth Amendment claim, where the officer was merely following what he understood to be a "validly enacted state law" and where the permit explicitly allowed the permittee to exclude others from the space. Id. at *7 (citation and quotation omitted). On Cocchini's version of the facts at hand, there is no such applicable law at play dictating Officer Spry's actions.

Should this distinction not be enough, Officer Spry's invocation of Blankenship repeats the same fatal flaw he made at the motion to dismiss stage—Blankenship contemplates the reasonableness of the officer's actions considering the probable cause inquiry relevant to the Fourth Amendment. Id. As the Court has already warned Officer Spry, case law demonstrating that he did not act unreasonably in his good faith belief that he had probable cause to arrest Cocchini for criminal trespassing is not enough to show he acted reasonably with respect to Cocchini's First Amendment discrimination claim. (Doc. No. 56 at 22–26). Indeed, the differences in Fourth Amendment wrongful arrest and First Amendment content discrimination

46

claims demonstrates this, as a lack of probable cause is required to establish the former, but not the latter. See Brown v. Lewis, 779 F.3d 401, 412–16 (6th Cir. 2015) (lack of probable cause is required to establish wrongful arrest claim). As the Court stated earlier in this litigation, to the extent the probable cause analysis may be relevant to the second prong of the qualified immunity analysis, it is only for First Amendment retaliation claims. Hall, 118 F.4th at 760–63; see also Nieves v. Bartlett, 587 U.S. 391, 415 (2019) (Gorsuch, J., concurring in part and dissenting in part) ("[W]hile it would be a mistake to think the absence of probable cause is an essential element of a First Amendment retaliatory arrest claim § 1983—or that the presence of probable cause is an absolute defense to such a claim—I acknowledge that it may also be a mistake to assume probable cause is entirely irrelevant to the analysis."). Even if the question of whether Officer Spry reasonably thought he had probable cause to arrest Cocchini is not entirely irrelevant to the analysis here, it cannot be conclusively decided in his favor where Cocchini presents evidence suggesting that was not the case.

At bottom, there is an utter lack of binding authority contrary to Parks and the various circuit court cases following it disputing Cocchini's assertion that it was clearly established at the time of his arrest that he had the right to speak about his discordant views at the Festival, so long as he did so peacefully and without causing a disruption. Given this, viewing the evidence in Cocchini's favor, Officer Spry is not entitled to qualified immunity as a matter of law.[15]

---

[15] While the Court denying Officer Spry's motion here defeats the "'driving force'" behind qualified immunity, i.e., "avoiding unwarranted discovery and other litigation costs," it does not preclude Officer Spry's invocation of the defense entirely. Everson v. Leis, 556 F.3d 484, 492 (6th Cir. 2009) (quoting Pearson v. Callahan, 555 U.S. 223, 232 (2009)). To be sure, "an official denied qualified immunity at summary judgment because of an issue of fact can re-raise the defense at trial." Bolick v. City of East Grand Rapids, 580 F. App'x 314, 322 (6th Cir. 2014). If the jury were to credit Defendants' evidence demonstrating that Cocchini's arrest and removal from Festival stemmed from his disruption at the event, rather than his speech, the outcome on this

47

4. Plaintiffs' Purported Free Exercise Claims

Having considered the parties' various arguments on Plaintiffs' First Amendment free speech and assembly claims, the Court turns to the remanding claims at issue. The City further moves for summary judgment on Plaintiffs' First Amendment free exercise of religion claims on the same basis that it seeks summary judgment on their free speech claims. (Doc. No. 66 at 21). While both the City and this Court reserve some skepticism as to whether Plaintiffs sufficiently allege these claims, there are at least some allegations in each of the three Complaints suggesting Plaintiffs at least tried to. (See Case No. 3:24-cv-00223, Doc. No. 1 ¶ 1 (mentioning violations of Russel's, Slayden's, and Young's free exercise rights); Case No. 3:24-cv-00497, Doc. No. 1 ¶¶ 98(e), 104(l) (alleging the City's actions chilled Brown's "free exercise of religious expression")). In any event, Plaintiffs' silence on this issue, both in their responsive and affirmative briefing, speaks volumes. Brown v. VHS of Michigan, Inc., 545 F. App'x 368, 372 (6th Cir. 2013) ("This Court's jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment.") (citation omitted). Even if Plaintiffs do assert such claims, their nonresponsive briefing demonstrates they have now waived them. See id. Given this, the Court will grant the City's motion on this ground.

5. Brown's Due Process Claim

The City next argues that it is entitled to summary judgment on Brown's Fourteenth Amendment Due Process claim, in which he alleges that the City violated his due process rights by giving Franklin Pride, TN proprietary control over speech on public property in an *ad hoc* and

issue could very well be different than that which the Court comes to here after crediting Cocchini's version of events in full.

discriminatory manner. (Case No. 3:24-cv-00497, Doc. No. 1 ¶¶ 101–08). The City contends its conduct was not arbitrary or unconstrained in a way that would support Brown's due process claim. It reasons that it acted in accordance with the Festival's permit ordinance and required Franklin Pride to follow standard rules that prohibited discrimination at the Festival. (Doc. No. 86 ¶¶ 11, 12, 33, 69, 74). Brown provides no response to the City's argument on this claim, (see generally Doc. No. 85), and even omits it from his affirmative summary judgment briefing.[16] Because the City has discharged its burden of showing that its actions did not violate Brown's due process rights, and Brown has utterly failed to present evidence creating a dispute of fact in response, thereby abandoning his claim, the Court will grant the City's motion in this respect. See Delphi Auto. Sys., LLC v. United Plastics, Inc., 418 F. App'x 374, 381 (6th Cir. 2011) ("[A] district court cannot grant summary judgment in favor of a movant simply because the adverse party has not responded. The Court is required, at a minimum, to examine the movant's motion for summary judgment to ensure that he has discharged that burden.") (citation omitted); see also Brown, 545 F. App'x at 372.

      6. Plaintiffs' Requests for Declaratory Relief

The City also contends that it is entitled to summary judgment on Plaintiffs' requests for declaratory relief, given it is entitled to summary judgment on their underlying claims. (Doc. No. 66 at 25). Because there is a genuine dispute of material fact on Plaintiffs' First Amendment claims, this argument fails and the City is not warranted summary judgment on that basis. See supra, Section III.1.C.

---

[16] Brown's failure to do so violates this Court's Judicial Preferences, providing yet another reason to deny Brown's motion. Judicial Preferences ¶ 4 (motions for partial summary judgment may be filed "only after permission is granted by the Court"). The same is true for the remaining Plaintiffs' omission of their declaratory judgment claims from their affirmative briefing.

7. Brown's Request for Injunctive Relief

Finally, the City challenges the validity of Plaintiffs' requests for injunctive relief. (Doc. No. 66 at 25). Specifically, the City contends that Plaintiffs have not sufficiently alleged that the City will continue to violate Plaintiffs' rights in the future, meaning the Court lacks jurisdiction over Plaintiffs' requested relief. (Id.). Plaintiffs provide no response, likely because only one of them, Brown, seeks injunctive relief in this matter. (See Doc. No. 85; see also Doc. No. 28; Case No. 3:24-cv-00223, Doc. No. 1; Case No. 3:24-cv-00497, Doc. No. 1). Because Brown has apparently abandoned his request for injunctive relief and fails to carry his burden of establishing Article III standing to seek that requested relief, the City's motion will be granted in this respect and Brown's request for injunctive relief against the City will be dismissed. See Brown, 545 F. App'x at 372 (a claim is abandoned when the plaintiff fails to respond to the motion for summary judgment); see also Coyne v. American Tobacco Co., 183 F.3d 488, 494 (6th Cir. 1999) ("A plaintiff bears the burden of demonstrating standing."). To the extent that the City seeks judgment on this issue for the other four Plaintiffs, because they do not seek such relief, the City's motion will be denied.

IV. **CONCLUSION**

For the foregoing reasons, the Court will rule as follows: Plaintiffs' Motion for Summary Judgment (Doc. No. 61), Officer Spry's Motion for Summary Judgment (Doc. No. 69), and Plaintiffs' Motion to Strike Affidavits (Doc. No. 73) will be denied; and the City's Motion for Summary Judgment (Doc. No. 65) will be granted in part on Plaintiffs' First Amendment free exercise claims, Brown's request for injunctive relief and his Fourteenth Amendment Due Process claim, and will be denied in all other respects. Further, because Cocchini, Russel, Young, and Slayden have each abandoned their Fourteenth Amendment Equal Protection Clause claims, they will be dismissed from this action. (Doc. No. 85 at 2 n.1).

An appropriate order will enter.

_____
WAVERLY D. CRENSHAW, JR.
UNITED STATES DISTRICT JUDGE